IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 2:21-430 |
| | ) | |
| DESMOND FODJE BOBGA | ) | |

**SENTENCING MEMORANDUM**

Desmond Bobga's participation in the fraud scheme for which he faces
sentencing is inseparable from the ongoing violence and political situation in his
country, Cameroon. Faced with few opportunities and small risk of survival, young
Cameroonian men like Desmond Bobga turn to education – and, sometimes, to crime
– to survive and escape their circumstances. Desmond fled Cameroon to Romania
because of his stance against the ongoing civil war in Cameroon. His participation in
the fraud scheme funded his escape. He is not proud of his choices, and he accepts
responsibility for them. He also asks this Court to take into account all the
circumstances described below that factored into his decisions.

"Life in Cameroon, honestly, is terrible, if I could find a word. . . . You have all
these degrees but you can't find a job. . . You have to find someone you know to help
you have a job," explained Julie Bosung, Desmond Bobga's maternal aunt.[1] Ms.

---

[1] Exhibit A, Video interview with Julie Bosung, March 12, 2022, at
approximately 00:34. Quoted dialogue from Exhibit A is transcribed as best as
possible with light edits by counsel for ease of understanding. Unless otherwise
indicated, additional information in this memorandum comes from the defense team's
interviews with Mr. Bobga, his mother, and his maternal aunt, Julie Bosung, and
maternal grandmother, Theresia Lumah Epse Foncham.

Bosung is a nurse who lives in Maryland. She fled Cameroon because of the violence and the lack of job opportunities there.

Desmond Bobga and his family are from of the Anglophone region of Cameroon, which is English-speaking. Cameroon is in a civil war between the Anglophone and majority Francophone Cameroonian government, where the Anglophones are seeking to create their own country. Many people in Cameroon, including Desmond and his family, are trapped in the middle of the two factions.

Since 2017, the anglophone separatist fighters (called Ambazonians, or "Amba boys") have been waging war against their government.[2] Ambazonians torture, kidnap, and kill civilians.[3] At least 4,000 civilians, including aid workers, have been killed and more have been displaced in the North-West and South-West regions during this civil war.[4] Armed Ambazonians control some towns by having lockdowns, which restrict business operation and movement into, out of, and within the towns.[5] Ambazonians are known to kidnap and imprison young men who refuse to join their ranks or offer support.[6]

---

[2] *See* WORLD REPORT: Cameroon, *Human Rights Watch* (2022), https://www.hrw.org/world-report/2022/country-chapters/cameroon.
[3] WORLD REPORT 2022.
[4] WORLD REPORT 2022.
[5] U.S. Department of State, Cameroon 2020 Human Rights Report, 29 (2021), https://www.state.gov/wp-content/uploads/2021/10/CAMEROON-2020-HUMAN-RIGHTS-REPORT.pdf.
[6] *See* Ex. A at approx. 03:07.

One tactic used by Ambazonian fighters has been a boycott of education to keep students from learning French, which is taught in all government funded schools and many private schools. Ambazonians routinely attack, kidnap, and kill students and educators.[7] They are suspected of bombing a university and have destroyed and bombed schools.[8] As recently as February 2022, Ambazonians kidnapped ten teachers because they would not shut down a school for disabled children associated with the Cameroonian government in Bamenda, a town where Desmond lived.[9]

For several years, Desmond has resisted Ambazonians attempting to recruit him or extort money from him and his family members. He has spoken out against the violence, especially as to violence against students and schools, and he and family members have paid a steep price. Desmond's parents both worked in education, and he is a dedicated student. He wanted to continue his education, which the Ambazonians are trying to block. Ambazonians had him on a list of "wanted peacekeepers" as early as 2019.[10] However, Desmond continued his public speaking into 2020 and until his arrest in this case.

---

[7] *See supra* WORLD REPORT 2022 (explaining that at least 700,000 students were not attending school in March 2021 because of the crisis).

[8] "Cameroon, Armed Separatists' Attack on Education," *Human Rights Watch* (Dec. 15, 2021) https://www.hrw.org/news/2021/12/15/cameroon-armed-separatists-attack-education.

[9] "Cameroon Separatists Abduct Teachers at School for Disabled," *Voice of America* (Feb. 25, 2022) https://www.voanews.com/a/cameroon-separatists-abduct-teachers-at-school-for-disabled/6458852.html.

[10] *See* Letter and photos from Ms. Patience, Exhibit B.

Desmond's mother, Sebyonga Patience Tita Epse Fodje ("Ms. Patience") explained that Desmond is a "peace advocate."[11] "Unlike his peers who were scared and could not speak out against the Ambaxonian fighters (separatists), [Desmond] stood up and advocated for peace," she wrote.[12] His aunt explained, "Desmond was not supportive of the Amba boys, he wanted to do everything peacefully, so he became a target."[13]

The school massacre that most affected Desmond was in Kumba on October 24, 2020.[14] The government reports that Ambazonians were responsible for killing seven children and injuring at least thirteen others.[15] The Cameroonian government responded by accusing residents of failing to tell them about the gunmen before the attack, but community members disagree with this view.[16]

Desmond spoke out against the Kumba massacre in a video he posted to social media that went viral. He spoke of peace and the need for education and understanding. Then, Ambazonians issued a statement saying they wanted Desmond, dead or alive. The Ambazonians also called and messaged Desmond,

---

[11] *See* Exhibit B.
[12] *Id.*
[13] Ex. A at approx. 07:50.
[14] "Cameroon: Gunmen Massacre School Children," *Human Rights Watch* (Nov. 2, 2020) https://www.hrw.org/news/2020/11/02/cameroon-gunmen-massacre-school-children.
[15] *Id.*
[16] *Id.*

demanding he join them, give them money, or die. Desmond's advocacy was covered in local newspaper articles, shown in these excerpts:[17]



[17] *See* Exhibit C, Excerpts of press coverage of Mr. Bobga's public speech.

5



Ms. Patience, Desmond's mother, was kidnapped, assaulted, and left for dead by Ambazonians following Desmond's advocacy. She was saved from a ditch by someone passing by. Her attackers told her they would do worse if her son did not stop his "peace propaganda."[18] "It was devasting for us. I thank god [Ms. Patience] is alive right now," explained Ms. Bosung.[19]

The rest of Desmond's family continues to suffer in Cameroon. Ambazonians burnt down a house in a family compound because of Desmond's advocacy. Ms. Patience was in the compound at the time but survived by hiding in the bush.

---

[18] *See* Ex. B.
[19] Ex. A at approx. 11:22.

Ambazonians continue to contact and threaten Ms. Patience. Desmond's uncle and cousin are currently missing and believed to be either held by Ambazonians for ransom or murdered. Desmond's family cannot afford to pay the ransoms. Ms. Patience is fearful because she knows that the Ambazonians have made their way into Yaoundé, the city where she lives. Ms. Patience cannot tell who they are, so she cannot avoid them. She knows that the government will not protect her from the Ambazonians because they have done nothing to help her with her two missing family members. Ms. Patience lives in fear, and under constant threat, for her life and her family members' safety.

Desmond Bobga's father was murdered when he was about 6 years old.[20] As the only and oldest son, he was left to try and take care of his mother and sister in a country without opportunities for anyone without a personal connection to government, or money to bribe an official.[21] Desmond tried to join the military, but he could not afford the bribe required and did not have family connections to pull strings. His mother tried to open a hair salon, but it closed after 6 months because men from the government came to take money from her daily, calling it "rent."

Desmond sold goods at a market with his friend to try and support his family.[22] Many times, the Ambazonian fighters burned his store because Desmond would not

---

[20] PSR ¶ 40.
[21] *See* Ex. A at approx. 13:54.
[22] Ex. A at approx. 09:55.

give them money.[23] Ms. Bosung explained that young people sell goods in the market because "they can't have a job."[24] A lot of the younger people steal to survive. They'll "snatch your bag from the supermarket" and then explain that they have no choice, they have to eat.[25]

Ms. Bosung explained that even after studying, if someone like Desmond wanted to become a doctor or a lawyer, he would have to sit for an exam, and "if you don't have money to bribe, you don't have a seat to take an exam."[26] Unemployment is so high in Cameroon that employers negotiate with employees to pay them less than minimum wage.[27] Cameroon's economic freedom score is below regional and world averages.[28]

Desmond's additional employment efforts were not successful, and he focused on his studies.[29] Eventually, he decided to flee Cameroon to pursue his education in Romania, a safer country where he could go to school. He moved to Romania in January 2020, during the time period of the conspiracy in this case. Desmond pursued

---

[23] Ex. A at approx. 09:55.

[24] *Id.* at approx. 01:41.

[25] *Id.* at approx. 02:12.

[26] Ex. A at approx. 15:15.

[27] U.S. Department of State, Cameroon 2020 Human Rights Report, 52 (2021), https://www.state.gov/wp-content/uploads/2021/10/CAMEROON-2020-HUMAN-RIGHTS-REPORT.pdf.

[28] 2022 Index of Economic Freedom: Cameroon, *The Heritage Foundation* (2022) https://www.heritage.org/index/country/cameroon.

[29] *See* PSR ¶¶ 48-51.

his university education in Romania seriously, and he focused on security governance, and specifically, on the security dilemma in Africa.[30]

Desmond was arrested in Romania on December 3, 2020, and extradited to the United States.[31] He does not have legal status in the United States, and upon completion of his sentence, he will be removed to Cameroon.[32]

Desmond Bobga agrees that the intended amount of loss, as reflected in the plea agreement, is $111,920.[33] The conspiracy involved at least 10 individuals in addition to Desmond in at least 3 countries, including the United States.[34] Desmond had never been to the United States prior to his extradition here. He did not receive an amount of money even close to the total loss amount, and he likely received less than $50,000. However, he understands and he accepts responsibility for his part in the illegal scheme that resulted in $111,920 of intended loss to victims.

---

[30] *See* Exhibit D, Letter of Recommendation from Professor Adrian Daniel Stan, Babeş-Bolyai University, Cluj, Romania (June 18, 2021).

[31] PSR ¶ 2. Counsel asks this Court to note that Mr. Bobga was held in "immigration custody in anticipation of a federal indictment" since his arrest in Romania as of this date and recommend to the BOP that presentence credit be awarded under 18 U.S.C. § 3585(b) as of this date. *See e.g.*, *Paz-Salvador v. Holt*, No. 3:10-CV-2668, 2011 WL 3876268, at *3 (M.D. Pa. Aug. 31, 2011) ("[U]nlike ICE detainees solely awaiting removal, those being held in immigration custody in anticipation of a federal indictment for illegal re-entry are entitled to credit for their time held awaiting indictment.") (citing cases).

[32] *See* Page 1 (noting detainer from Immigration and Customs Enforcement).

[33] *See* PSR ¶ 15.

[34] *See infra* Section I.B (summarizing evidence relating to other co-conspirators).

From December 3, 2020, until the sentencing hearing date of April 8, 2022, Desmond Bobga will have been in custody for over 16 months. After accounting for credit for good time that will be awarded by the Bureau of Prisons, that amounts to a sentence of nearly 19 months. This is right below the low end of the Guidelines of 21 to 27 months' imprisonment.[35] Accordingly, a small variance is requested, to a sentence of time served, which is entirely justified under the § 3553(a) factors.

I.    **The factors in 18 U.S.C. § 3553(a) warrant a variance below the Guidelines range and specifically, a time served sentence.**

The Court must fashion a sentence "sufficient, but not greater than necessary" to comply with the purposes of sentencing by considering the 18 U.S.C. § 3553(a) factors.[36]

---

[35] PSR ¶ 55.

[36] The parsimony provision of 18 U.S.C. § 3553(a) is the "overarching principle" of sentencing, directing courts to impose a sentence "sufficient, but not greater than necessary," *United States v. Olhovsky*, 562 F.3d 530, 552 (3d Cir. 2009), considering:
(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed-
(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment…;
(B) to afford adequate deterrence…;
(C) to protect the public…; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment…;
(3) the kinds of sentences available;
(4) the advisory Guidelines range;
(5) any pertinent policy statements…;
(6) the need to avoid unwarranted sentence disparities; and
(7) the need to provide restitution….

Mr. Bobga specifically requests a sentence of time served without a term of supervised release to follow because he will be removed from the United States upon the conclusion of his sentence, and under U.S.S.G. § 5D1.1(c), no term of supervision is recommended.[37]

## A. A variance is warranted because of the trauma and violence that characterized Mr. Bobga's childhood and young adulthood, contributing to the lack of opportunity in Cameroon.

As described in the Introduction, Desmond Bobga has witnessed violence and trauma in his life that is unimaginable to many people in the United States. Research shows that those experiences affect an individual's decision making.

Dr. Richard G. Dudley, Jr. wrote about childhood trauma and its effects for the Harvard Kennedy School and the National Institute of Justice in 2015. He explained that "some children are exposed to events that are exceptionally stressful. The impact of such traumatic events is more severe when they occur repeatedly … Trauma can also result if a child witnesses acts of violence, including domestic violence and street violence."[38] Trauma-exposed children tend to be anxious, hypervigilant, and "hyperreactive to perceived threats of danger."[39]

Experiencing childhood trauma also means that as an adult, the individual is hampered in his ability to "correctly consider risk and made healthy life decisions,"

---

[37] *See* Addendum to PSR.
[38] *Childhood Trauma and Its Effects: Implications for Police* by Richard G. Dudley, Jr., M.D., Harvard Kennedy School, National Institute of Justice, July 2015.
[39] *Id*. at 6.

according to a 2017 study.[40] It also means that without treatment, "no threat of punishment [is] likely to be effective in changing this deficit" in an adult's decision-making process.[41]

As shown in the Introduction, Mr. Bobga's life in Cameroon was characterized by abuse, trauma, and violence. His decision to participate in an illegal fraud scheme must be viewed through a lens of trauma, as well as the prevalence of violence and illegal activity in Cameroon.

### B. A variance is warranted because of the number and location of additional, uncharged co-conspirators, all of whom received some of the money used to calculate Mr. Bobga's Guidelines.

Mr. Bobga understands that he is liable, as a member of the charged conspiracy, for the acts of his alleged co-conspirators. He agrees that he participated in the fraud scheme, and he accepts responsibility for his role, including the stipulations in the plea agreement as to amount of loss and restitution. The overall loss amount agreed to in the plea agreement is $111,920.[42] Mr. Bobga agrees that his actions resulted in that amount of intended loss. However, there are a number of other participants in the scheme in several different countries, and all of them received money. There is no evidence that Mr. Bobga received all of the money (or

---

[40] Mimi Kirk, "The Long Shadow of Childhood Trauma," *Bloomberg City Lab* (Dec. 4, 2017), https://www.bloomberg.com/news/articles/2017-12-04/the-impact-of-childhood-trauma-on-adult-behavior.

[41] *Id.*

[42] PSR ¶ 10.

even most of the money) at issue in this case, and an additional variance is warranted on this basis. Here is why:

In Rule 16 discovery and at the preliminary hearing, the government presented evidence about a fraud scheme and Mr. Bobga's participation in that scheme. The government's evidence showing that total amount included Google Voice communications between conspiracy members and victims, primarily with two Google Voice numbers, one ending in 8514, and one ending in 4502.[43] The government presented evidence that the 8514 number was tied to Mr. Bobga, but it said that the 4502 number "may and may not be" tied to Mr. Bobga.[44] The Court found that the 4502 number "has not been linked to Mr. Bobga," and, instead, was tied to "an alleged co-conspirator."[45]

In the government's calculation, the total amount of money paid associated with the 8514 number was roughly $49,000, and the additional amount solicited brought the loss number associated with the 8514 number to $66,065.[46] The loss amount associated with the 4502 number was nearly $46,000 (with just under $30,000) in money received by co-conspirators.[47] This means that, at most, Mr. Bobga

---

[43] There is at least one other Google Voice number linked to the scheme, ending in 0347, but that number did not play a primary role in victim communications. *See* Preliminary Hearing Tr. June 9, 2021, at 22, 56, attached as Exhibit G.

[44] *See* Preliminary Hearing Tr. June 9, 2021 (Ex. G), at 55.

[45] *Id.* at 67.

[46] *See* Exhibit E, Loss Calculations (Redacted) at page 1 (showing amounts solicited and received through communications with 8514 number).

[47] *See id.* at page 2 (showing (showing amounts solicited and received through communications with 4502 number).

personally received less than $50,000 from victims, and may not have received anything close to that amount.

Additional evidence showed that other co-conspirators also received money:

- The government agreed that additional, uncharged co-conspirators were located in Romania, Cameroon, Maryland, and anywhere else where the victims were told to send money, including Florida.[48]

- The government agreed that during the time period covering the conspiracy, Mr. Bobga did not travel from Cameroon other than to Romania.[49]

- The government has no evidence of communication between co-conspirators or bank records from any of the co-conspirators, including Mr. Bobga.[50]

- The government has no evidence of voice recordings for any of the communications with victims.[51]

- For Victim 5, there is only evidence of communications with the 4502 Google Voice number, and that Victim sent money to Virginia.[52]

- Even where the 8514 number communicated with victims, there is no evidence that Mr. Bobga received any of that money. For example, in

---

[48] Preliminary Hearing Tr. June 9, 2021 (Ex. G), at 21, 25, 58.
[49] *Id.* at 23.
[50] *Id.* at 23, 25.
[51] *Id.* at 40.
[52] Preliminary Hearing Exhibit 5A-R, Tr. June 9, 2021 (Ex. G), at 16.

communications between the 8514 Google Voice number and Victim 3, there is evidence that Victim 3 sent money to Maryland.[53]

- During cross-examination, counsel pointed out that additional IP addresses linked to the target email accounts used as part of the fraud scheme linked to locations in Cameroon, Romania, the United States, and Bangladesh.[54]

The evidence of Mr. Bobga's receipt of money is much more limited, and it includes the following:

- Mr. Bobga received a total of $1840 from Victim 2.[55]

- The government presented evidence that a total of 7 individuals in Romania received money wired from Victim 1 in March 2020.[56]

## C. A variance does not create a disparity with other sentences.

Variances in fraud cases – including in cases with individuals who are similarly situated to Mr. Bobga – are the norm, and a time served sentence (equivalent to 19 months' imprisonment) does not create a disparity with other individuals who come before this Court.

---

[53] Preliminary Hearing Exhibit 3B-R; Tr. June 9, 2021 (Ex. G), at 15-16.

[54] Preliminary Hearing Tr. June 9, 2021 (Ex. G), at 29-31.

[55] Preliminary Hearing Exhibit 2B-R; Tr. May 21, 2021, at 32. The transcript of this portion of the hearing is attached as Exhibit F.

[56] *See* Preliminary Hearing Exhibit 1B-R; Tr. May 21, 2021 (Ex. F) at 36.

Out of 5,706 sentences under § 2B1.1 in 2021, nearly 42% were below-guidelines sentences with downward variances.[57] Out of 3,202 fraud sentences where imprisonment was imposed in fiscal year 2021, the average length of imprisonment was 18 months.[58] The average extent of a downward variance in a fraud case in fiscal year 2021 was 59.8%.[59]



For non-U.S. citizens in criminal history category I sentenced under § 2B1.1 for fraud offenses, the great majority of them (74.9%%) were sentenced to less than 24 months' imprisonment (as shown in the figure on the left).[60]

---

[57] 2021 Annual Report and Sourcebook, Table 32, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2021/Table32.pdf.

[58] *Id.*, Table 15, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2021/Table15.pdf.

[59] *Id.*, Table 40, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2021/Table40.pdf.

[60] Interactive Data Analyzer, U.S. Sentencing Commission, filters: Fiscal Year: 2020; Circuit: All; State: All; District: All; Race: All; Gender: All; Age: All; Citizenship: Non-U.S. Citizen; Education: All; Crime Type: All; Guideline: § 2B1.1; Drug Type: All; Sentencing Zone: All; Criminal History: I; Career Offender Status: All, *available at* https://ida.ussc.gov/analytics/saw.dll?Dashboard.

In this group, the average and median imprisonment length was 18 (average) and 7 (median) months, as shown here in the figure below.[61]



With these statistics in mind, a sentence the equivalent of 19 months represents a sentence right in the middle of similarly situated first-time fraud defendants who are facing immigration consequences and deportation. A 19-month sentence would not create a disparity with other, similar sentences.

**D. A variance is warranted because of Mr. Bobga's impending removal from the United States.**

Because of Mr. Bobga's impending removal, he deserves a prison sentence that is less severe than similarly situated defendants. He will not be eligible for a reduction in sentence if he completes certain BOP programming, like the Residential Drug Abuse Program, or home detention / halfway house placement. Indeed, on this

---

[61] *Id.*

basis, district courts have found that a variance is warranted. *See United States v. Pacheco-Soto*, 386 F. Supp. 2d 1198, 1205 (D.N.M. 2005) ("[I]t is solely because of Defendant's status as a deportable alien that he faces an unwarranted increase in the severity of his sentence.").[62]

### E. The pretrial conditions of confinement at the ACJ and Butler County Prison warrant a sentence without further prison time.

Desmond Bobga's year of federal pretrial custody at the ACJ and Butler County Prison were made much more severe due to the restrictions imposed as a result of the COVID-19 pandemic. Mr. Bobga was incarcerated at the ACJ between April and August 2021, during the height of the pandemic restrictions there. After that, he was transferred to Butler County Prison, which also had lockdowns and reduced opportunities for recreation, programming, and communication.

At the ACJ, since March 2020, prisoners have been unable to receive visitors and are only reportedly restarting visits as of March 2022.[63] The little programming that existed has been or drastically curtailed.[64] Most dramatically, prisoners were restricted to their cells for 23 hours per day from March 2020 until only several

---

[62] *See also* BOP Policy § 550.55(b), "Inmates Not Eligible for Early Release" (listing inmates with ICE detainers as ineligible for early release).

[63] *See* Allegheny County Jail, COVID-19 Information, Our Response, https://www.alleghenycounty.us/jail/index.aspx.

[64] *See* Transcript at 4, Jail Oversight Board Meeting (July 2, 2020), available at https://alleghenycontroller.com/resource/jail-oversight/.

months ago, when the restrictions were lifted.[65] This is near-solitary confinement for a 29-year old young man who committed a nonviolent offense and a first-time offender and has never before been to prison in his life.

Mr. Bobga's pretrial incarceration has been nearly totally during the pandemic restrictions. He has been subjected to more time spent confined in his cell, no visits, little to no programming opportunities, and reduced freedom to move around the jail including in recreational areas. He asks this Court to consider the severity of these restrictions as a mitigating factor.

Because the conditions of pretrial confinement in this case are harsher than would otherwise occur due to the pandemic, they justify a reduced sentence. Courts in this District, including this Court, have varied below the Guidelines in at least four cases as a result of harsher presentence confinement conditions at the local jails contracted with the U.S. Marshals, and especially at the ACJ. *See* Statement of Reasons, *United States v. Hurt*, Case No. 17-cr-285 (Fischer, J.) (Nov. 6, 2020) (granting variance, in part, because defendant "served time during COVID-19 with protocols in place, making it more onerous and also restricted access to programming"); Statement of Reasons, *United States v. Stevens*, Case No. 18-cr-32 (Fischer, J.) (Nov. 5, 2020) (same); Sentencing Hr'g, *United States v. Reddix*, Case No. 19-376 (Conti, J.) (Mar. 18, 2021) (granting variance, in part, because Allegheny

_____

[65] *See* Transcript at 12, Statement by Warden Harper at Allegheny County Jail Oversight Board Meeting (Jan. 7, 2021), available at https://alleghenycontroller.com/resource/jail-oversight/.

County Jail has ("ACJ") had "horrible conditions with the lock down" because of the "the inability to see loved ones [and] inability to have more frequent phone calls with family," as well as the lack of programming); Sentencing Hr'g, *United States v. Cox*, Case No. 18-cr-50 (Cercone, J.) (May 18, 2021) (granting variance, in part, based on the "limitations on [defendant's] liberty that prisoners normally have" in jail). *See also United States v. Sutton*, 973 F Supp. 488, 493 (D.N.J. 1997), *aff'd* 156 F.3d 1226 (3d Cir. 1998) ("Unusual pretrial confinement … in either length or severity of condition, can properly be considered by the sentencing court.").

Some states are passing bills requiring that sentencing courts reduce the amount of prison time for individuals who are in custody during the COVID-19 pandemic. New Jersey has passed a bill shortening prison sentences for individuals serving time during the pandemic.[66] Delaware has introduced similar legislation.[67]

Other district courts have recently cited the harsh prison conditions and lack of programming opportunities due to the coronavirus as reasons to vary downward in imposing sentence. *See e.g.*, *United States v. William White*, 19-cr-325-RC (D.D.C. Aug. 5, 2020) (referring to more punitive and less rehabilitative conditions at the jail

---

[66] *See* "New Jersey Covid-19 Inmate Time Credits Bill Becomes Law, (March, 11, 2021) https://chamlinlaw.com/blog/new-jersey-covid-19-inmate-time-credits-bill-becomes-law/.

[67] Eichmann, Mark, "Delaware bill would cut jail time during health crisis," WHYY (March 16, 2021), https://whyy.org/articles/delaware-bill-would-cut-jail-time-during-health-crisis/.

due to COVID-19); *United States v. Antonio Cox*, 19-cr-235-JDB (D.D.C. July 29, 2020) (acknowledging lack of programming due to COVID-19).

Even before coronavirus, district and appellate courts recognize that conditions of confinement that are harsher than would otherwise occur may justify a reduced sentence. *See, e.g.*, *United States v. Ortiz*, No. CRIM. 06-858(KSH), 2007 WL 4208802, at *3 (D.N.J. Nov. 27, 2007) (granting downward variance due to pretrial conditions of confinement); *United States v. Pressley*, 345 F.3d 1205 (11th Cir. 2003) (pretrial conditions of confinement may justify a reduced sentence).

For similar reasons, a reduced sentence is justified here.

**F. Mr. Bobga is a non-violent, first-time offender, and at low risk of recidivism; the Sentencing Commission's policy statements support a sentence without further incarceration.**

Indeed, research shows that a prison sentence can harm non-violent, low-risk offenders like Mr. Bobga. Instead, recidivism is best reduced through treatment in the community, as opposed to correctional intervention.[68] Low-risk offenders like Mr. Bobga have a higher likelihood of recidivism following placement in intense correctional settings, where they are exposed to higher-risk offenders and placed in a setting that "disrupt[s] the factors that make them low-risk."[69]

---

[68] Understanding the Risk Principle: How and Why Correctional Interventions Can Harm Low-Risk Offenders, *Topics in Community Corrections* (2004), *available at* http://caparc.org/uploads/3/5/2/7/35276822/high_low_risk_article.pdf.

[69] *Id.* at 7.

21

Title 18, United States Code 3553(a)(5) requires that this Court consider applicable United States Sentencing Commission Policy Statements. In January 2009, the Commission issued a report entitled Alternative Sentencing in the Federal Justice System ("Report").[70] Therein, the Commission emphasizes that the Sentencing Reform Act of 1984, which provides the "foundation" for federal sentencing policy, "requires that the federal sentencing guidelines 'reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense . . ."[71] Further, in providing the background for the Report, the Commission states:

> Increasingly, criminal justice professionals have argued that dwindling prison space should be reserved for the most serious and dangerous offenders, necessitating a reconsideration of alternative sanctions for first-time and non-violent offenders. The appeal of alternatives to incarceration has continued to increase in the wake of reports of the ever-growing prison population. As of 2008, more than one in every 100 adults are incarcerated in the United States. That large, and still growing, population cost the states more than $49 billion in 2007. In addition to the monetary costs, social costs of imprisonment include the separation of families, isolation from the community, and transitional difficulties when offenders re-enter the community.[72]

---

[70]    The    "Report"    is    available    at http://www.ussc.gov/Research/Research_Projects/Alternatives/20090206_Alternatives.pdf.

[71] *Id.* at 2 (emphasis added).

[72] Report at 1-2.

The Report concludes:

> Effective alternative sanctions are important options for federal, state, and local criminal justice systems. For the appropriate offenders, alternatives to incarceration can provide a substitute for costly incarceration. Ideally, alternatives also provide those offenders opportunities by diverting them from prison (or reducing time spent in prison) and into programs providing the life skills and treatment necessary to become law-abiding and productive members of society.[73]

Mr. Bobga's crime, although serious, is non-violent. He has no prior history with the criminal justice system in any country. After his sentence is over, he will be removed and unable to reenter the United States. With zero criminal history points and no sign of re-offending, he cannot be counted among "the most serious and dangerous offenders" for whom federal prison space should be allocated. We do not need to pay to continue to incarcerate Mr. Bobga when he will not be back in the United States, and where he has already served nearly two years' imprisonment for his offense.

## G. A sentence without further prison time provides for sufficient deterrence and adequately protects the public.

It is not the length of Mr. Bobga's potential sentence, but rather, the certainty of punishment that drives the deterrent effect of prison time.[74] A study by the U.S. Department of Justice concluded that "[s]ending an offender to prison isn't a very

---

[73] *Id.* at 20.

[74] National Institute of Justice, Five Things About Deterrence (Sept. 2014), *available at* https://ncjrs.gov/pdffiles1/nij/247350.pdf.

effective way to deter crime . . . . Prisons actually may have the opposite effect."[75] This is why a lengthier sentence for Mr. Bobga cannot be justified on the basis of deterrence. "[L]engthy prison sentences cannot be justified on a deterrence-based, crime prevention basis."[76] The Brennan Center for Justice similarly concludes, "Empirical studies have shown that longer sentences have minimal or no benefit on whether offenders or potential offenders commit crimes."[77]

Respect for the law is evident in Mr. Bobga's conviction, and does not necessitate a longer prison sentence. "Respect for the law is promoted by punishments that are fair, however, not those that simply punish for punishment's sake." *United States v. Stern*, 590 F. Supp. 2d 945, 956-57 (N.D. Ohio Dec. 19, 2008). "A sentence that is disproportionately long in relation to the offense is unjust and . . . fails to promote respect [for the law]." *United States v. Ontiveros*, 2008 U.S. Dist. LEXIS 58774, 2008 WL 2937539, at *3 (E.D. Wisc. July 24, 2008). "There is no reason to believe that respect for the law will increase if a defendant who deserves leniency is sentenced harshly any more than there is reason to believe that respect for the law will increase if a defendant who deserves a harsh punishment receives a slap on the wrist." *Stern*, 590 F. Supp. 2d at 957.

---

[75] *Id.*

[76] Daniel S. Nagin, Deterrence in the Twenty-First Century, 42 Crime & Just. 199, 202 (2013).

[77] Brennan Center for Justice, What Caused the Crime Decline? 26 (Feb. 2015), https://www.brennancenter.org/publication/what-caused-crime-decline.

## CONCLUSION

For all of these reasons, along with the reasons in Mr. Bobga's other filings, and those that will be presented at the sentencing hearing, after taking into account all of the § 3553(a) factors, a sentence of time served without no term of supervision to follow is sufficient but not greater than necessary to fulfill the goals of sentencing.

Respectfully submitted,

*/s/ Sarah Levin*
Sarah Levin
Assistant Federal Public Defender