IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA,

      Plaintiff,

                                Criminal Action

    vs.

                                No. 20-1365

DESMOND FODJE BOBGA,

      Defendant.
_____


     Transcript of ZOOM VIDEOCONFERENCE PRELIMINARY
EXAMINATION recorded on Wednesday, June 9, 2021, in the
United States District Court, 700 Grant Street, Pittsburgh,
Pennsylvania, before The Hon. Patricia L. Dodge, United
States Magistrate Judge


APPEARANCES:

For the Government:          Ira M. Karoll, Esq.
                         United States Attorney's Office
                         700 Grant Street, Ste. 4000
                         Pittsburgh, PA  15219

                         Wei Xiang, Esq.
                         DOJ-Civ
                         450 Fifth Street NW, Ste. 6400
                         Washington, DC  20001

For the Defendant:           Sarah E. Levin, Esq.
                         Federal Public Defender's Office
                         1500 Liberty Center
                         1001 Liberty Avenue
                         Pittsburgh, PA  15222-3714

Court Reporter:              Deborah Rowe, RMR, CRR
                         700 Grant Street, Ste. 5300
                         Pittsburgh, PA  15219
                         (412) 471-2510


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

**Exhibit G**

1                      P R O C E E D I N G S

2                              - - -

3              (8:57 a.m.; Zoom videoconference proceedings:)

4              MR. BANAS:  Sir, I'm going to put you in a room

5    with your attorney for a few minutes so that she may talk to

6    you for a few moments before we begin.  Okay?

7              THE DEFENDANT:  Okay.

8              (Defendant and defense counsel, Ms. Levin, confer

9    privately in Zoom breakout room.)

10             MR. KAROLL:  Mike, at the last hearing Sarah had

11   asked that we give someone capability to share their screen

12   to show exhibits.  And I'm not sure -- I know you came to

13   this when we were already halfway through, but I wanted to

14   just check if we would have that capability.

15             We have Miss Sandy Maher on.  She's ready and able

16   I believe, but I want to make sure we have the capability

17   while we're waiting.

18             MR. BANAS:  Yes.  Once she's ready to share any

19   documents, I'll just make her a temporary co-host, and she

20   will be able to share her screen at that point.

21             (9:03 a.m.; Zoom videoconference proceedings:)

22             MS. LEVIN:  We are back and ready as soon as

23   Mr. Bobga makes his way back in.

24             MR. BANAS:  Excellent.  I'll close the breakout

25   rooms.

**Exhibit G**

1              (9:04 a.m.; Zoom videoconference proceedings:)

2              MR. BANAS:  The United States District Court for

3    the Western District of Pennsylvania is now in session, The

4    Honorable Judge Dodge presiding.

5              THE COURT:  All right.  Good morning, everyone.  I

6    want to remind everyone that we're here today in the matter

7    of the United States versus Desmond Bobga at 20-MJ-1365.

8    Could counsel identify themselves, please?

9              MR. XIANG:  Good morning, Your Honor.  Wei Xiang

10   and Ira Karoll on behalf of the Government.

11             THE COURT:  Good morning.

12             MS. LEVIN:  Good morning, Your Honor.  Sarah Levin

13   on behalf of Mr. Bobga.

14             THE COURT:  Good morning.  I know that we asked

15   this the last time.  Ms. Levin, I'm assuming that Mr. Bobga

16   continues to consent to proceeding here today by video?

17             MS. LEVIN:  Yes, Your Honor.

18             THE COURT:  All right.  So we're going to mute him

19   just because I know there's some background noise.

20             Mr. Bobga, at any time if you need to speak or talk

21   with your attorney, I'll ask you just to raise your right

22   hand, and we'll make sure that we understand what your issue

23   is.

24             I also want to remind counsel that at the

25   conclusion of our last session both of you gave estimates as

**Exhibit G**

A. BOLING – DIRECT

1   to the amount of time that you still required.  So we've

2   allotted an additional two hours for today's proceeding.  We

3   will need to make a hard stop at 11:15.  So please plan your

4   morning accordingly so that we can conclude today.

5           With that, Mr. Xiang, are you ready to proceed?

6           MR. XIANG:  Yes, Your Honor.

7           THE COURT:  All right.  Please feel free to do so.

8   Special Agent Boling, I just want to remind you that you're

9   still under oath.

10          (The witness, SPECIAL AGENT ANNA BOLING, having

11   been previously sworn, further testified as follows:)

12                    DIRECT EXAMINATION

13  BY MR. XIANG:

14    Q.   Agent Boling, last time we went over Victims 1, 2, 4

15  and 6.  Today we'll go over 3 and 5.  So let's go back to

16  Government Exhibit 8B as in boy.

17          THE COURT:  What exhibit was that?

18          MR. XIANG:  B, Your Honor, as in boy.

19          THE COURT:  Okay.  Got it.

20          MR. XIANG:  If Ms. Maher can put that up on the

21  screen.

22          MS. MAHER:  I'm sorry.  Did you say Exhibit AB?

23          MR. XIANG:  8, 8B.

24  BY MR. XIANG:

25    Q.   And Special Agent Boling, if we go to the second to

**Exhibit G**

A. BOLING – DIRECT

 1  last line in that list?

 2     A.   Yes.

 3     Q.   Just to rehash, this was the list of cookie linked

 4  accounts to fodjebobga1@gmail.com; is that right?

 5     A.   Yes.

 6     Q.   And that second to last E-mail account that's listed

 7  on there, what is that?

 8     A.   That's unitedpetsafe2009@gmail.com.

 9     Q.   Did the FBI obtain data from Google for that account

10  as well?

11     A.   Yes.

12     Q.   Let's go to Government Exhibit 11A as in Adam.  Is

13  this the subscriber information for unitedpetsafe2009?

14     A.   Yes.

15     Q.   Let's go to the middle, the recovery E-mail line.

16  According to Google, what was the recovery E-mail account for

17  unitedpetsafe2009?

18     A.   The recovery E-mail for this account is

19  fodjebobga1@gmail.com.

20     Q.   And let's turn to page 2.  In the middle for 2020,

21  January 10, 09:45 UTC, those two -- that line and the line

22  below that?

23     A.   Uh-huh.

24     Q.   Is this the same 144 IP address that we saw with the

25  other counts that we went over the last time?

**Exhibit G**

A. BOLING - DIRECT

1    A.    Yes.

2    Q.    And on or about the same date and time?

3    A.    Yes.

4    Q.    So now let's go to Government Exhibit 11F as in Frank.

5  What is this exhibit?

6    A.    This is an E-mail from Paxful to the

7  unitedpetsafe2009@gmail.com.  And it's a subject line saying,

8  "Your I.D. has been verified."

9    Q.    Was this E-mail recovered from the unitedpetsafe2009

10  Google mailbox?

11   A.    Yes.

12   Q.    And what's the receipt date of this E-mail?

13   A.    January 10, 2020.

14   Q.    And the name, who is it addressed to?

15   A.    It's addressed to Desmond Fodje Bobga in the contents

16  of the E-mail.

17   Q.    Let's go to Government Exhibit 11G as in George,

18  another E-mail from Paxful to unitedpetsafe2009?

19   A.    Yes.

20   Q.    And then just in the first paragraph, the last line of

21  that -- the last two lines of that first paragraph?

22   A.    Uh-huh.

23   Q.    Does it also note the same IP address we've been

24  talking about, the 144 address?

25   A.    Yes.

**Exhibit G**

A. BOLING – DIRECT

1    Q.    And where according to this login E-mail is that
2    address located, come back to?
3    A.    Cluj, Romania.
4    Q.    Now let's go to Government Exhibit 11D as in David.
5    What is this exhibit?
6    A.    This is an E-mail from the unitedpetsafe gmail dated
7    in 2019 to fodjebobga1@gmail.com with an attachment.
8    Q.    What's the date and time of this E-mail?
9    A.    This is October 2, 2019.
10    Q.    At?
11    A.    2:47 a.m.
12    Q.    Okay.  Let's now go to Government Exhibit 11E as in
13    Eddie.  This is the redacted version that's on the screen
14    here, but do you recognize this document?
15    A.    Yes.
16    Q.    And specifically this particular exhibit, is this the
17    copy of the attachment to the E-mail that we saw in 11D?
18    A.    Yes, it is.
19           MR. XIANG:  Ms. Maher, are you able to pull up a
20    compare of 11E and 8G as in George?
21           (Brief pause.)
22           MR. XIANG:  I'm sorry.  8G.
23    Q.    Special Agent Boling, were these two exhibits the same
24    document?
25    A.    Yes.

**Exhibit G**

A. BOLING – DIRECT

1           MR. XIANG:  Now can we pull up side by side 11D as
2   in David and 8C as in Charlie?
3   Q.    Special Agent Boling, we went over 8C last time.  This
4   was an E-mail from fodjebobga1 to -- outbound from
5   fodjebobga1; right?
6   A.    Correct.
7   Q.    And the time stamp shown on that is ten minutes after
8   fodjebobga1 received the E-mail from United Pet Safe?
9   A.    Yes.
10  Q.    Attaching the same document that was received from
11  United Pet Safe?
12  A.    Yes.
13          MR. XIANG:  Now let's go to Government's Exhibit
14  11B as in boy.
15  Q.    And what we have up on the screen is the redacted
16  version.  Special Agent Boling, do you recognize this
17  exhibit?
18  A.    Yes.
19  Q.    How do you recognize it?
20  A.    This is a draft E-mail.  It was unsent in the
21  unitedpetsafe2009@gmail.com mailbox dated March 17, 2020.
22  Q.    Do you recognize the content of this E-mail?
23  A.    Yes.
24  Q.    Specifically, it's redacted here, but under receiver
25  address, the name, address, phone number and E-mail address,

**Exhibit G**

A. BOLING – DIRECT

1    do you recognize who that is referring to?

2    A.   Yes.  The name, E-mail address, phone number listed

3    there is Victim 1.

4    Q.   And is the time or the date contemporaneous with the

5    time of the communications with Victim 1 that we talked about

6    last time?

7    A.   Yes.

8    Q.   And then the other information listed on there, Hector

9    Cantu, address, number, E-mail, do you recognize those?

10   A.   Hector Cantu is the alias for the individual

11   communicating with Victim 1.

12   Q.   Based on these things that we went over today, do you

13   have any opinion on whether the user of unitedpetsafe2009 and

14   the user of fodjebobga1 were the same person?

15   A.   Yes.  In my opinion they're the same person.

16   Q.   And that's the Defendant here?

17   A.   Yes.

18   Q.   Now let's go to Government Exhibit 11C as in Charlie.

19   Do you recognize this document?

20   A.   Yes.

21   Q.   How do you recognize it?

22   A.   This is an E-mail from unitedpetsafe2009 gmail to

23   Victim 3 describing the shippers for the puppy.

24   Q.   And what was the date of this E-mail?

25   A.   March 29, 2019.

**Exhibit G**

A. BOLING – DIRECT

1   Q.   Did the FBI interview Victim 3 at any point?

2   A.   Yes.

3   Q.   Approximately when was that?

4   A.   Victim 3 was interviewed on March 31, 2020, and

5   April 1 of 2020.

6   Q.   Can you briefly summarize what Victim 3 told the

7   interviewing agent?

8   A.   In March Victim 3 was looking to purchase a teacup

9   Chihuahua puppy in March of 2019.  Victim 3 was contacted by

10  E-mail and instructed to send $600 via Moneygram.  The $600

11  was sent.  No puppy was received.

12       MS. LEVIN:  Your Honor, at this point if Agent

13  Boling is reading from something, I would ask her to identify

14  that and --

15       THE WITNESS:  It's the 302 from the case agent.

16       MS. LEVIN:  And identify the specific document and

17  the specific date; and if it's already been provided to me in

18  discovery, that's fine, but I need to know what the document

19  is.

20       THE COURT:  Agent Boling, could you describe the

21  document that you are referencing?

22       THE WITNESS:  Yes.  It's an FBI 302 written by the

23  case agent.  It was -- the date of entry was April 2, 2020.

24  BY MR. XIANG:

25  Q.   And the serial number?

**Exhibit G**

A. BOLING – DIRECT

1   A.   It should be –– let's see what the serial ––

2         MR. XIANG:  Ms. Levin, the ––

3   A.   I don't have the serial numbers on the printout.

4         THE COURT:  Ms. Levin, do you have ––

5         MR. XIANG:  It was provided to you ––

6         MS. LEVIN:  I have many documents, Your Honor.  I

7  would like to somehow identify this specific one.

8         THE COURT:  Of course.

9         MS. LEVIN:  I trust Government counsel's

10  representation that that's been provided to me.

11         THE COURT:  Okay.  Thank you.  You can proceed.

12  BY MR. XIANG:

13   Q.   Staying on 11C, let's go to the second to the last

14  page.

15         MS. MAHER:  Do you have a page number?  I could

16  look for the page numbers for this exhibit.

17         MR. XIANG:  10.

18         THE COURT:  Is this the document with the Supreme

19  Court at the heading?

20         MR. XIANG:  Yes, Your Honor.  So I guess one

21  page –– one more page over.  Yes.

22         And Ms. Levin, so you have it, it's Serial Number 2

23  and 3 relating to Victim 3.

24  BY MR. XIANG:

25   Q.   Special Agent Boling, is this an attachment to the

**Exhibit G**

A. BOLING — DIRECT

1   E-mail we just talked about?

2      A.    Yes.

3      Q.    Does this list Victim 3's information?

4      A.    Yes.

5            MR. XIANG:  We won't read this document, but down

6   at the bottom right-hand corner, could we just highlight the

7   bottom half?  Thank you.

8      Q.    Where it says William K. Suter, Clerk of the Supreme

9   Court of the United States, did the FBI look into William K.

10  Suter?

11     A.    Yes.

12     Q.    What, if anything, did you find about him?

13     A.    William K. Suter was the 19th Clerk of the Supreme

14  Court, and he retired in 2013.

15     Q.    What was the source of that information?

16     A.    Google.

17     Q.    And particularly what was the source that was found on

18  Google?

19     A.    I don't recall.

20     Q.    Do you have the criminal complaint?

21     A.    Yeah.

22     Q.    Can you read Paragraph 35 of the affidavit --

23     A.    Yes.

24     Q.    And if that refreshes your memory, feel free to answer

25  the question.

**Exhibit G**

A. BOLING – DIRECT

1    A.    Yes.  The official website of the Supreme Court.

2    Q.    And one last thing on 11C, if we can go back to page

3    9, do you see the telephone number listed in the signature

4    there?

5    A.    Yes.

6    Q.    Ending 0347?

7    A.    Yes.

8    Q.    Do you recognize that from any of the Google accounts

9    that we've talked about?

10    A.    Yes.

11    Q.    Let's pull up Government Exhibit 4B as in boy.  Do you

12    recognize this document?

13    A.    Yes.

14    Q.    What is this?

15    A.    This is the data as returned by Google on the warrant

16    for the 8514 Google Voice number.

17    Q.    Is this an excerpt of communications?

18    A.    Yes.  It's an excerpt of communications with Google

19    Voice number 8514 and Victim 4.

20    Q.    Is the 0347 number on here as well?

21    A.    Yes.  So this is a group message that's shown in

22    Column B with the 8514 number and the 0347 number.

23    Q.    Specifically is that in line 4996?

24    A.    Yes.

25    Q.    Did Victim 4 explain to the FBI what happened here?

**Exhibit G**

A. BOLING – DIRECT

1    A.    Yes.  Victim 4 attempted to --

2            THE COURT REPORTER:  Excuse me.  There's

3    background noise, and I'm having trouble filtering that out

4    when the agent is speaking.

5            THE COURT:  Please repeat that, Agent.

6    A.    Yes.  Victim 4 brought together a group text chat

7    between the 8514 number and the 0347 number, the former being

8    the seller-breeder and the latter being transport service in

9    an effort to resolve the issues that they were having.

10    Q.    So according to Victim 4, the 0347 number was the

11    shipper for the puppy?

12    A.    Yes.

13    Q.    And let's go to Government Exhibit 9C as in Charlie.

14    What does this exhibit show?

15    A.    This is data again returned by Google in response to

16    the 8514 communications with 0347.

17            THE COURT:  Agent, you broke up on that last

18    response.  So I wonder if you could repeat your answer, and

19    I'm going to ask you to just make sure that you're close to

20    your audio feed so that we can hear you.

21            THE WITNESS:  Yes, Your Honor.

22            THE COURT:  Thank you.

23    A.    This is the data returned by Google for a search

24    warrant for the 8514 Google Voice number.  This is an excerpt

25    of communications between 8514 and 0347.

**Exhibit G**

A. BOLING – DIRECT

1    Q.    So in Column C, the two types -- can you explain what

2    inbound refers to?

3    A.    Inbound refers to an inbound voice call.

4    Q.    And so here, the one inbound call in Column D, what is

5    the duration?  What was the duration for that?

6    A.    33 seconds.

7    Q.    And there were four other columns -- I'm sorry -- four

8    other rows of data here?

9    A.    Yes.

10   Q.    Showing what?

11   A.    Missed calls between the two parties.

12   Q.    Let's go back to Victim 3.  In Government Exhibit 3B,

13   can we pull that up, B as in boy?  Agent Boling, do you

14   recognize this document?

15   A.    Yes.

16   Q.    What is this?

17   A.    This was returned by Moneygram showing the payment

18   sent by Victim 3.

19   Q.    The $600 payment that you mentioned before?

20   A.    Yes.

21   Q.    Just so we can locate this on page 2, is this the

22   identifying information here for Victim 3 as the sender?

23   A.    Yes, it is.

24   Q.    Let's go to page 3.  What is the information that's

25   shown on this page?

**Exhibit G**

A. BOLING - DIRECT

1    A.    This shows the location from where the payment was

2    sent by Victim 3 and the date and the amount.

3    Q.    And then page 5, what's shown on here?

4    A.    This is where --

5    Q.    Sorry.  Starting from Column BG and going right.

6    A.    This is where the money was received.

7    Q.    So to summarize, this particular transaction went from

8    Indiana, Pennsylvania, to Baltimore, Maryland, according to

9    the exhibit?

10   A.    Yes.

11   Q.    And lastly, Government Exhibit 3A as in Adam, do you

12   recognize this document?

13   A.    Yes.  This is data returned from Google in a response

14   to a search warrant for the 4502 Google Voice number.  This

15   is an excerpt of communication between that voice number and

16   Victim 3.

17   Q.    And here there were no written communications; is that

18   right, that's shown in the exhibit?

19   A.    Correct.

20   Q.    Let's go to Exhibit 5A as in Adam.  Do you recognize

21   this?

22   A.    Yes.  Again, this is data returned by Google for a

23   search warrant of the 4502 Google Voice number.  This is an

24   excerpt of communications between 4502 and Victim 5.

25            MS. LEVIN:  I'm sorry.  I didn't hear that last

**Exhibit G**

A. BOLING – DIRECT

1    part.

2              THE COURT:  Would you repeat your answer, please?

3              THE WITNESS:  Yes, Your Honor.

4    A.    It's the data returned by Google in response to the

5    search warrant for Google Voice number 4502.  This exhibit

6    shows the excerpt of that data for Google Voice number 4502

7    and communication with Victim 5.

8              THE COURT:  Thank you.

9    Q.    We won't go over all of the messages, just like with

10   the other victim.  So I'll direct you first to line 10719.

11   A.    Okay.

12   Q.    What's on here?

13   A.    This is an outgoing message from 4502 to Victim 5 on

14   April 24, 2019.  And it is the Moneygram information to

15   transfer $600.

16   Q.    Let's go down to the bottom of that page.  Was that

17   sent and received, the payment?

18   A.    Yes.  4502 sent an outbound message that same day

19   saying, "Perfect.  I got it."

20   Q.    And just so we have it in 10642, what city and state

21   does Victim 5 say she's in?  It's redacted on the screen, but

22   in the original?

23   A.    Cheswick, Pennsylvania.

24   Q.    Now let's go to line 10968.  This is another request

25   for a $600 Moneygram payment.

**Exhibit G**

A. BOLING - DIRECT

1    A.    Yes.

2    Q.    And then in the middle of that page, 10986?

3    A.    That is Victim 5 sending a message to 4502 stating "I

4    just sent it to you, have it, did you get it."

5    Q.    Any response?

6    A.    4502 responds with an outbound message saying "Yes

7    perfect I got it."

8          MR. XIANG:  And if we could just highlight these

9    next two rows.

10         MS. LEVIN:  Your Honor, I certainly appreciate

11   Government's counsel going through everything very carefully,

12   but in the interests of time, I'm wondering whether at this

13   point, you know, it might make sense to focus specifically on

14   connections to Mr. Bobga.  I've heard a lot of information

15   now about a transfer to Virginia.  I'm just hoping we can

16   streamline a little bit.

17         MR. XIANG:  Sure.

18         THE COURT:  Yeah.  Why don't we do this?  Certainly

19   you can ask the agent to summarize what happened with respect

20   to Victim 5, for example, and then move on to other matters

21   you want to cover.

22         I think that this exhibit reflects the

23   communications.  She can testify about a summary of those

24   communications, and perhaps we can avoid getting into the

25   detail of each communication that is reflected in these

**Exhibit G**

A. BOLING – CROSS

1   documents.

2          MR. XIANG:  Yes, Your Honor.

3   Q.    So Agent Boling, did the FBI interview Victim 5 at any

4   point?

5   A.    Yes.

6   Q.    Approximately when was that?

7   A.    That was on May 28, 2020.

8   Q.    Did Victim 5 confirm making the two Moneygram payments

9   that we discussed --

10  A.    Yes.

11  Q.    -- in the messages?

12  A.    Yes.

13  Q.    And according to Victim 5, did she receive any puppy

14  or any refund?

15  A.    No.

16         MR. XIANG:  Your Honor, I do not have any further

17  questions for Special Agent Boling at this time.

18         THE COURT:  All right.  Then, Ms. Levin, you may

19  cross-examine.

20         MS. LEVIN:  Okay.  Thank you.  Can we take down the

21  screen share?  Thank you.  Now I can see everybody.

22                         CROSS-EXAMINATION

23  BY MS. LEVIN:

24  Q.    Hi, Agent Boling.  Good morning.  You said that you

25  took over as case agent in April of 2021?

**Exhibit G**

A. BOLING — CROSS

1    A.    Correct.

2    Q.    And I take it you've reviewed a number of documents in

3    this case?

4    A.    Yes.

5    Q.    Did you conduct any interviews yourself in this case?

6    A.    No.

7    Q.    So any opinions that you gave today are consistent

8    with your review of documents?  Is that fair?

9    A.    Yes.

10   Q.    And not based on any independent knowledge you have

11   beyond those documents?

12   A.    No.

13   Q.    And you're not testifying today here as an expert;

14   correct?

15   A.    No.

16   Q.    It's a little confusing when you say no and I say

17   correct for the court reporter.  So --

18   A.    Apologies.

19   Q.    So is it correct that you're not here testifying today

20   as an expert?

21   A.    Correct.  Yes.

22   Q.    And any opinions you give today are just based on your

23   review of the documents presented in Court?

24   A.    Yes.  Correct.

25   Q.    Do you have a sense of how many different people

**Exhibit G**

A. BOLING - CROSS

1    participated in the conspiracy that's charged here today?

2    A.    In my opinion I'd approximate two, maybe three.

3    Q.    And what are the locations of those other individuals

4    or the -- as best as you know?

5    A.    As best as I know, I would identify Romania and

6    Cameroon.

7    Q.    So an additional participant -- and Romania and

8    Cameroon are the individuals in addition to Mr. Bobga?  Is

9    that correct?

10   A.    Yes.

11   Q.    And did you review documents that contained

12   communication between any of those other individuals and

13   Mr. Bobga?

14   A.    No.

15   Q.    Okay.  So no E-mails between them?

16   A.    No, not from my review.

17   Q.    And no phone calls or text messages between them?

18   A.    The only phone calls were reviewed in the exhibit

19   between the 8514 Voice number and the 0347 Voice number,

20   which I don't have any indication of what those

21   communications consisted of.

22   Q.    What's your -- we were just looking at those

23   communications.  And let me see if I can go back to them.

24   That was I believe in Exhibit 4B.

25            MS. LEVIN:  And can I ask the Court for permission

**Exhibit G**

A. BOLING – CROSS

1    to share my screen?

2              THE COURT:  Of course.  Mr. Banas, if you can

3    assist us with that?

4              MR. BANAS:  I've just made Miss Levin a co-host.

5              THE COURT:  Thank you.

6              MS. LEVIN:  Thank you.  But it still says I can't.

7    While we figure it out in the background, I can ask a

8    different question.

9              THE COURT:  Okay.

10   BY MS. LEVIN:

11   Q.   Agent Boling, you testified on direct examination

12   about a number of communications in Exhibit 4B between the

13   8514 Google Voice number and the 0347 Google Voice number.

14   Do you remember that testimony?

15   A.   Yes, in reference to Exhibit 4B.

16   Q.   In reference to Exhibit 4B, correct.  Did you review

17   IP data for either of those two Google Voice users at the

18   time of those communications?

19   A.   I did not.

20   Q.   Are you aware of whether IP data exists for either

21   8514 or 0347 during the time of those communications?

22   A.   Not to my knowledge at this point in time.

23   Q.   And you talked about you're familiar with how Google

24   Voice works; correct?

25   A.   Yes.

**Exhibit G**

A. BOLING – CROSS

1    Q.   And in your work, you investigate Google Voice users?
2    Is that fair?
3    A.   Yes.
4    Q.   And are you familiar with Google Voice being an
5    Internet based phone number?
6    A.   Yes.
7    Q.   And that phone number can be accessed from anywhere in
8    the world?
9    A.   Yes.
10   Q.   What is your understanding of –– strike that.  I'll
11   rephrase.  Mr. Bobga at the time of extradition was located
12   in Romania; correct?
13   A.   Yes.
14   Q.   And that's where he was a student?
15   A.   Yes.
16   Q.   And before then it's your understanding that he was in
17   Cameroon?
18   A.   Yes.
19   Q.   Are you aware of any other travel by Mr. Bobga?
20   A.   No.
21   Q.   And is it your opinion based on your review of
22   documents that he did not travel to any other country?
23   A.   Yes.
24   Q.   Meaning –– of course then he did not travel to the
25   United States?

**Exhibit G**

A. BOLING – CROSS

1    A.    Based on my review, I have no knowledge of any other

2  travel.

3    Q.    Okay.  And on direct testimony you testified about a

4  number of wire transfers, including transfers I believe

5  through Victim 3 to the United States; correct?

6    A.    Yes.

7    Q.    And I believe Victim 3 was to Maryland; is that right?

8    A.    Yes.

9    Q.    And there were other transfers of money to the two

10  locations in the United States; is that correct?

11    A.    I don't recall.

12    Q.    Did you review any wire transfers from the locations

13  in the United States where victims were told to send money to

14  any other country?

15    A.    Yes.  Victim 1 directed wire transfers from Western

16  Union to Romania.

17    Q.    So my question -- let's go to Victim 3.  You testified

18  that Victim 3 was told to send money to Maryland; correct?

19    A.    Yes.

20    Q.    Did you review any wire transfers of money from

21  Maryland to any other country in connection with your

22  investigation?

23    A.    No.

24    Q.    Did you review bank records for Mr. Bobga?

25    A.    Not to my knowledge, no.

**Exhibit G**

A. BOLING – CROSS

1    Q.    Do you mean that the FBI to your knowledge does not
2    have bank records for Mr. Bobga?
3    A.    Correct.
4    Q.    Based on your review of documents, your understanding
5    is the money that was sent to Maryland, that's the end of
6    your knowledge about that money; correct?
7    A.    Yes.
8    Q.    So is it fair to say based on that that there's an
9    additional participant in the scheme located in Maryland?
10   A.    Yes.  It's likely.
11   Q.    And would that be true for any other places where
12   victims were told to send money in the United States?
13   A.    Yes.
14   Q.    So then there are some number of additional
15   participants in the scheme located in the United States?  Is
16   that fair?
17   A.    Yes.
18   Q.    Okay.  And you testified on direct examination that an
19   IP address identified some kind of geographic location.  Is
20   that fair?
21   A.    Yes.
22   Q.    And that location is associated with where that
23   account was accessed at a certain point in time?  Is that
24   fair?
25   A.    Yes.

**Exhibit G**

A. BOLING - CROSS

1    Q.    And when an IP address -- when you testified that a

2    certain IP address is connected to somewhere in Romania,

3    what's your sense of how specific -- or let me rephrase that

4    question.

5            When you testified on direct examination about IP

6    addresses being connected to Romania, based on your review of

7    the documents, what's your understanding of those locations

8    in Romania?  How specific is that address?

9    A.    I can't give an opinion on the exact location of where

10   service providers' towers are or in what geographic precision

11   it is to where the account is accessed from.  But when an IP

12   address in the vicinity of a tower hits that connection, it

13   gives a fairly precise location of a geographic area of where

14   the account was accessed.

15   Q.    And by fairly precise, for the IP addresses that you

16   testified about on direct examination going back to Romania,

17   what's your understanding sitting here today of those exact

18   locations?

19   A.    One of the IP addresses came back to the Babes-Borlya

20   University.

21   Q.    Okay.  But beyond it being associated with the

22   university specifically, you don't have further information?

23   Is that fair?

24   A.    No.  That is fair, yes.

25   Q.    And for IP addresses that are associated then with a

**Exhibit G**

A. BOLING - CROSS

1    location in Cameroon, what's your understanding of the

2    specificity of those exact locations?

3      A.    I don't recall.  I recall looking at the location of

4    the IP addresses in Cameroon, but I can't recall to the

5    specificity of where.

6      Q.    Are you aware of any locations in Cameroon being tied

7    specifically by -- specifically to Mr. Bobga in one way or

8    another?

9      A.    Is it okay if I look at the affidavit?

10      Q.    Sure.  And if you want to look at -- if you're

11    referring to a particular paragraph, just let me know what

12    paragraph.

13      A.    Sure.  So Paragraph 39, specifically the last sentence

14    prior to E relating to Victim 4.  On or about October 12,

15    2019 all three E-mail accounts, fodjebobga1, joebah77, and

16    unitedpetsafe were accessed at the same time from the same IP

17    address, which, based on an IP address lookup, is assigned to

18    a Cameroonian telecommunications provider.

19      Q.    Got it.  But beyond that information, you're not aware

20    of any other specificity as to the exact address?  Is that

21    fair?

22      A.    Yes.  That's fair.

23              MS. LEVIN:  Let's see if I can share my screen now.

24              THE COURT:  Let me now know if you can't.

25              MS. LEVIN:  I still can't do it, and I remember

**Exhibit G**

A. BOLING - CROSS

1    this happened to us on one other occasion, and didn't we have

2    to end the entire session and then start again?

3           THE COURT:  I think so, but what I'm going to ask

4    is whether the Government would be willing to share their

5    screen just so that we don't have delays associated with

6    what's probably an issue that we'll never figure out how to

7    solve.

8           MS. MAHER:  Your Honor, I would be fine sharing the

9    exhibits with the defense.

10          THE COURT:  Thank you very much.  We appreciate

11   that.  What exhibit would you like to share, Ms. Levin?

12          MS. LEVIN:  I'll go through, but I won't ask you to

13   do anything fancy like compare or blow things up.  Can we

14   please see Exhibit 8A?

15   BY MS. LEVIN:

16    Q.   So Agent Boling, if we scroll to page 15, the very end

17   of Exhibit 8A, is it fair to say that this exhibit represents

18   IP logins for the fodjebobga E-mail address going back to

19   July of 2019?

20    A.   Yes.  That's correct.

21    Q.   And is your understanding that these are all of the

22   logins for this particular E-mail address for this particular

23   period of time?

24    A.   Yes.

25    Q.   And that's what Google provided to the Government?  Is

**Exhibit G**

A. BOLING – CROSS

1   that fair?

2   A.   Yes.

3   Q.   And it also says that the E-mail address was created

4   in 2014.  That's on page 1?

5   A.   Yes.

6   Q.   And did agents ask for IP address information from the

7   time of creation or only for this specific moment in time

8   that's captured here?

9   A.   I don't know.

10  Q.   You weren't the case agent back then; right?

11  A.   Right.

12  Q.   Okay.  Turning to Exhibit 9A, please?  So this is IP

13  address information for the joebah E-mail address?  Is that

14  fair?

15  A.   Yes.

16  Q.   And it shows that that E-mail account was created in

17  2009?

18  A.   Yes.

19  Q.   Is that right?  And that E-mail address, I'd like you

20  to turn, please, to page 4.  And do you see the IP address on

21  December 23, 2019, that begins with 104?

22  A.   Yes.

23  Q.   I take it you don't have an independent memory of

24  where that IP address resolves to?  Is that fair?

25  A.   Fair.

**Exhibit G**

A. BOLING – CROSS

1    Q.   And is it also fair that one can look this information

2    up easily in terms of where an IP address resolves to, to a

3    specific geographic location?

4    A.   Yes.

5    Q.   So would it refresh your recollection –– and I can put

6    this up on the screen to show you that this IP address

7    resolves to a location in the United States?

8            THE COURT:  Were you done with your question, Ms.

9    Levin?

10           MS. LEVIN:  I was.

11   A.   What was the question, ma'am?  I'm sorry.

12   Q.   Did you at any point in time research where the 104 IP

13   address goes to?

14   A.   No.

15   Q.   Okay.  And would it –– you know, by using –– I don't

16   know if you're able to access it right now on your end, but

17   if you're able to put this IP address into your computer ––

18   A.   Okay.

19   Q.   And you can do this to check me, but, you know, when I

20   did this, it resolved to an IP address in the United States.

21   A.   Okay.

22   Q.   Is that anything that you learned through your review

23   of documents in this case?

24   A.   No.

25   Q.   Okay.  And then if we go to page 8 of this same

**Exhibit G**

A. BOLING - CROSS

1    document, and I'm looking at -- I'd like to direct your

2    attention to September 12, 2019.  Do you see the IP address

3    there that begins with 202?

4    A.    Yes.

5    Q.    And did you at any point in time research where that

6    IP address resolves to?

7    A.    No.

8    Q.    And so you didn't see that that IP address resolves to

9    Bangladesh?

10   A.    No.

11   Q.    Looking at page 10 of this document, did you see the

12   IP addresses there that begin with 2001 and then a lot of

13   numbers and letters after that?

14   A.    Yes.

15   Q.    What's your understanding of what this IP address

16   represents?

17   A.    It looks to me like an IPv6 address.

18   Q.    What is that?

19   A.    It's just a longer version of an IPv4 IP address.

20   Q.    And when is that used in comparison to the other types

21   of IP addresses that we've looked at?

22   A.    Looking in respect to this document, it looks like

23   it's used earlier in the account logons.  So in 2019.

24   Q.    Does it indicate any different type of technology

25   being used as opposed to the type of IP address location

**Exhibit G**

A. BOLING – CROSS

1   access that you testified about on direct examination?

2   A.   Can you repeat the question?

3   Q.   Does it indicate any different type of technology

4   being used for –– does it have any significance to you in

5   terms of how the login at that point in time might have

6   occurred?

7   A.   It could represent a different piece of technology.  I

8   know from my training, you can turn on your IPv6 to go from

9   IPv4 to IPv6 on the same device.  But outside of that

10  knowledge, I don't know.

11  Q.   Okay.  And also in this particular document is it fair

12  to say that there are a number of failed logins from –– you

13  know, at least I'm counting three or four in more different

14  IP addresses?  Is that fair?

15  A.   Yes.  For page 10, I'm seeing four.

16  Q.   Got it.  And including in the year 2020.  So that

17  would be on pages 2 and 3?  There are failed logins from

18  various IP addresses?

19  A.   Yes.

20  Q.   And did you research where any of those failed logins

21  were attempted from?

22  A.   No.

23  Q.   Okay.  You testified on direct examination that you

24  reviewed ––

25          THE WITNESS:  Sorry to interrupt, Ms. Levin.  What

**Exhibit G**

A. BOLING - CROSS

1    was the first IP address we reviewed from that exhibit?

2    Q.    So I'm going to let Government counsel ask you that in

3    redirect, but for now I'm going to move on with my

4    cross-examination.

5    A.    Okay.

6         MS. LEVIN:  Can we take down the screen sharing for

7    a moment?  Thank you for doing that.

8    Q.    You testified on direct examination that you reviewed

9    information for the Google Voice number ending in 8514?

10   A.    Yes.

11   Q.    And you testified a few minutes ago that you did not

12   review any location information associated with that Voice

13   number?  Fair?

14   A.    Fair.

15   Q.    And did you review whether any other E-mail addresses

16   were associated with the 8514 Voice number?

17   A.    No.

18   Q.    Did you review any documents suggesting that any --

19   that there were more than one user of the Google Voice number

20   ending in 8514?

21   A.    I believe from my recollection, the Google Voice

22   number ending in 8514 corresponds to the joebah77 gmail

23   account.  And the recovery E-mail for that is fodjebobga1.

24   Q.    So any time a user uses the Google Voice number, does

25   the user have to be logged in to a certain E-mail account, or

**Exhibit G**

A. BOLING – CROSS

1   can the user just make a phone call through their voicemail?

2   A.   You have to be logged in to your account.

3   Q.   Okay.  So a user could be logged in to the joeba

4   E-mail account and make a phone call with the 8514 number?

5   Is that fair?

6   A.   Yes.

7   Q.   Okay.  Could we look at Exhibit 8I, please?  And

8   Agent, do you remember testifying about this exhibit on

9   direct examination?

10  A.   Yes.

11  Q.   Do you also have access to an unredacted version of

12  this exhibit?

13  A.   Yes.

14  Q.   And do you remember testifying that there are

15  additional students listed in Romania under the name Fodje

16  Bobga under that version of Exhibit 8I?  Is that fair?

17  A.   There is a Fodje Bobga listed, yes.

18  Q.   And in the redacted portion of that E-mail, there are

19  also additional students located in Romania?  Is that fair?

20  A.   Yes.

21  Q.   And some of those students also received money

22  associated with the fraud scheme charged?  Is that fair?

23  A.   Yes.

24  Q.   And I believe that two of those individuals are people

25  who Victim 1 was directed to send money to.  Is that fair?

**Exhibit G**

A. BOLING – CROSS

1    A.    Yes.

2    Q.    And that's what's shown I believe in Exhibit 1 -- you

3    don't have to refer to them now, but Exhibit 1A?

4    A.    Yes.

5          MS. LEVIN:  And can we please actually pull up

6    Exhibit 1A?  Thank you.  And can we go to line 8086?  I

7    believe it's on page 29.

8    Q.    And when we see the person in line 8086, is it fair

9    that that's another individual in Romania to whom Victim 1

10   was directed to send money?

11   A.    Yes.

12   Q.    And that individual with the first name Giddeon, that

13   individual is not listed as a student in Exhibit 8I.  Is that

14   fair?

15   A.    Yes.

16   Q.    So we've now talked about two students in Exhibit 8I

17   who received money in Romania and at least one additional

18   person identified in line 8086 of Exhibit 1A in Romania who

19   has received money.  Is that fair?

20   A.    Yes.

21         MS. LEVIN:  You can take this exhibit down, please.

22   Q.    Did you review any documents suggesting a transfer of

23   funds from any of those three individuals to Mr. Bobga?

24   A.    No.

25   Q.    So would that suggest that there are at least those

**Exhibit G**

A. BOLING - CROSS

1    three additional participants in the scheme in addition to

2    Mr. Bobga?

3      A.   Yes.

4           MS. LEVIN:  And can we pull up Exhibit 2B, please?

5      Q.   If we scroll -- the Exhibit 2B represents Victim 2

6    sending money in March 2020?  Is that fair?

7      A.   Yes.

8           MS. LEVIN:  And if we scroll over to the recipient

9    information, I believe it's on pages 6 of 7.  Can we go back

10   one -- I'll pull it up on my end.

11     Q.   If you look at pages 3 and 4, so I believe you

12   testified on direct that this represents two transfers to a

13   Desmond Bobga; is that fair?

14     A.   Yes.  The payee name and the address for where the

15   payment was to be sent.

16     Q.   And those are on successive days; right?  First

17   March 12, 2020, then March 13 in Column Y?

18     A.   Yes.

19     Q.   Okay.  So then if you go to page 4 in Column AE, is it

20   your understanding that the money is going one day to

21   Cameroon and the next day to Romania?

22     A.   The opposite.  So one day to Romania.  The next day to

23   Cameroon.

24     Q.   Okay.  Thank you.  And it's your understanding that

25   Mr. Bobga was located in Romania at that time; is that right?

**Exhibit G**

A. BOLING - CROSS

1    A.    Yes.

2    Q.    Did you review any bank account or money transfer

3    information suggesting that any money was sent from Cameroon

4    to Romania to him?

5    A.    No.

6    Q.    So this suggests to you then that somebody was on the

7    receiving end of that transfer to Cameroon?  Is that fair?

8    A.    Yes.

9    Q.    And it's somebody who's not Mr. Bobga; is that right?

10   A.    Yes.

11   Q.    So you testified on direct examination turning to

12   Counts 11 and 12.

13          MS. LEVIN:  You can take that down.  Thank you.

14          Can we pull up Exhibit 11C again, please?

15   Q.    And this is an E-mail on March 29, 2019, from

16   unitedpetsafe?  Is that fair?

17   A.    Yes.

18   Q.    And if we look at the subscriber information from

19   unitedpetsafe -- and I'll remind myself what that Exhibit

20   number is.  Maybe 9C?

21   A.    11A.

22   Q.    Thank you.  If you look at Exhibit 11A, is there any

23   IP address information for the date that this Moneygram was

24   sent in March 2019?

25   A.    No.

**Exhibit G**

A. BOLING – CROSS

1    Q.    So do agents have any information about the location

2    of the individual who sent an E-mail from that E-mail address

3    in March of 2019?

4    A.    No.

5    Q.    And the money in March of 2019 was sent to a person

6    located in Maryland; is that right?  And I believe -- if you

7    need reference, I believe it's in Exhibit 3B, page 5.

8    A.    Yes.  That's correct.

9         MS. LEVIN:  You can take down the document.  Thank

10   you.

11   Q.    For the attachment that you talked about that's the

12   subject of those last two counts, did you review any

13   information suggesting where that document was created?

14   A.    Can you reference the attachment again, please?

15   Q.    Oh, sure, if we can bring it back up.  Exhibit 9 --

16   no.  The one that we were just looking at.

17   A.    11?  11C?

18   Q.    Yes.  Thank you.  And I believe it's the last -- page

19   10 of that.  So on page 10, did you review any information

20   suggesting where that document was created?

21   A.    No.

22   Q.    Did you review any information suggesting that that

23   document was located anywhere other than within that E-mail

24   account?

25   A.    No.

**Exhibit G**

A. BOLING - CROSS

1          MS. LEVIN:  Okay.  We can take that back down.  You
2    can take down the screen share, please.
3      Q.   Agent Boling, from your review of documents, do you
4    have an understanding of how much money the Government
5    believes Mr. Bobga has personally received?
6      A.   Personally, no.
7      Q.   And do you have any understanding beyond what's listed
8    in the affidavit of how much money Mr. Bobga personally
9    received?
10     A.   No.
11     Q.   And obviously supplemented by any testimony today?
12     A.   No.
13         MS. LEVIN:  Your Honor, if I could have just one
14   minute to confer with Mr. Bobga, I think I might be ready to
15   conclude.
16         THE COURT:  Of course.  Mr. Banas, could you place
17   Mr. Bobga and Ms. Levin in a breakout room?  And why don't we
18   take -- is five minutes enough, or would you like a little
19   bit longer?
20         MS. LEVIN:  I think that can work.
21         THE COURT:  Okay.  We'll take a five-minute break
22   for that discussion.  So we'll be back here at approximately
23   10:26 or so.
24         MS. LEVIN:  Thank you.
25         MR. BANAS:  Excellent.

**Exhibit G**

A. BOLING – REDIRECT

1        (A recess was taken at 10:21 a.m. while Defendant
2   and defense counsel conferred in a private breakout room.)
3            (10:29 a.m.; Zoom videoconference continued:)
4            THE COURT:  All right.  Ms. Levin, are you prepared
5   to resume?
6            MS. LEVIN:  Thank you, Your Honor.  I believe maybe
7   just two more questions, and then I'll be finished.
8   BY MS. LEVIN:
9   Q.   Agent Boling, you can still hear me; right?
10  A.   Yes. I can hear you.
11  Q.   Okay.  Great.  Did you review any voice recording
12  information in connection with your investigation in this
13  case?
14  A.   No.
15  Q.   Did you review any evidence relating to who picked up
16  any of the wire transfers that you've testified about in this
17  case?
18  A.   No.
19           MS. LEVIN:  Okay.  I have nothing further for Agent
20  Boling.  Thank you, Your Honor.
21           THE COURT:  Thank you, Ms. Levin.  Mr. Xiang,
22  anything further from you on redirect?
23           MR. XIANG:  Yes, Your Honor.  Just two quick things
24  -- or one quick and one maybe not.
25                    REDIRECT EXAMINATION

**Exhibit G**

A. BOLING – REDIRECT

1    BY MR. XIANG:

2      Q.   The first is, Special Agent Boling, you asked about

3    the IP address that Ms. Levin brought up, the 104 IP address?

4      A.   Yes.

5      Q.   What do you want to say about that?

6      A.   I just wanted it for –– to mark it, to look up on my

7    own time.

8      Q.   Okay.  All right.  And the second thing, which is what

9    she ended on about who picked up the payments.  Let's go to

10   Exhibit 2B as in boy.  And let's go to page 6 and 7, pages 6

11   and 7.

12           On cross, Ms. Levin asked you about the two

13   particular Western Union transfers from Victim 1.  Do you

14   remember that?

15     A.   Is this Victim ––

16     Q.   I'm sorry.  From Victim 2.

17     A.   Yes.

18     Q.   And she asked you about whether the payments were

19   directed to Cameroon or Romania.  Do you remember that?

20     A.   Yes.

21     Q.   And you testified that one was to Cameroon and one was

22   to Romania.  Do you remember that?

23     A.   Yes.

24     Q.   Can you explain what's on pages 6 and 7 of this

25   Western Union record for Victim 2?

**Exhibit G**

A. BOLING — REDIRECT

1    A.    Yes.  Page 6, these columns represent starting with

2    Column AS, the send agent's country code --

3              THE COURT:  Excuse me.  The send agent's what?  I

4    missed that last word.

5              THE WITNESS:  Country code.

6              THE COURT:  Thank you.

7    A.    Column AT is the pay agent's name.  Column AU is the

8    pay agent's street address.  Column AV is the pay agent's

9    city.  And Column AX is the pay agent's ZIP.

10   Q.    And page 7?

11   A.    Page 7, the pay agent province, Column AY.  AZ is the

12   pay agent country, RO, both standing for Romania.  And the

13   rest, Column BB is Victim 2.

14   Q.    So where was the pay agent for the two Victim 2

15   Western Union transfers located?

16   A.    Romania.

17   Q.    So not Cameroon?

18   A.    Correct.

19   Q.    And what is the pay agent for purposes of the Western

20   Union wire transfer?

21   A.    The pay agent is the individual that is paid at the

22   location and picks up the money that was wired.

23   Q.    Is that the Western Union agent paying out the money

24   or the person who's actually receiving the money?

25   A.    It's the Western Union paying out.

**Exhibit G**

A. BOLING - REDIRECT

1    Q.   Okay.  So for these two Victim 2 transfers, the money

2    was paid out in what country?

3    A.   Romania.

4    Q.   Now let's go back to pages 3 and 4.  In Column V as in

5    Victor, that name, Desmond Fodje Bobga is what relation to

6    the receipt of the Western Union payment?

7    A.   The Column B represents the payee name provided by the

8    payee.

9    Q.   Let's go to Column AD.  It says Pid number.  Do you

10   see that?

11   A.   Yes.

12   Q.   And the I.D. number in Row 17, the number ending --

13   well, there's an entry ending in 864425; correct?

14   A.   Yes.

15   Q.   And let's flip over one page.  The next two columns --

16   or the next four columns, the address in Column AF says

17   Yaounde, and then it also says Cameroon; correct, the next

18   two columns?

19   A.   Yes.  AE and AF.

20          MR. XIANG:  Can we pull up side by side if we

21   can -- actually we don't need side by side -- 12B as in boy.

22   And can we expand on the right half, bottom right half?

23   Q.   Let's look up at the top corner there.  Do you see

24   that passport number?

25   A.   Yes.

**Exhibit G**

A. BOLING – REDIRECT

1    Q.   Is that the same number that's on the Western Union

2    record for the payee?

3    A.   Yes.

4    Q.   And then the address that's in the middle, do you see

5    that, Yaounde?

6    A.   Yes.

7    Q.   And this is the Defendant's Cameroonian passport?

8    A.   Yes.

9    Q.   So do the passport I.D. number and the address for the

10   Defendant here match the payee information for that Western

11   Union transfer that we just talked about?

12   A.   Yes.

13   Q.   Now, let's go back to -- well, we could stay on this

14   exhibit, but go to the top left, the I.D. code, the card.  Do

15   you see the line that ends in 615?

16   A.   Yes.

17   Q.   Okay.  Just make a mental note of that.

18   A.   Uh-huh.

19   Q.   Now can we flip to 12C as in Charlie, so the front

20   half of that card.  And then did you note the number that's

21   on the top corner there ending in 575270?

22   A.   Yes.

23   Q.   Just keep that in mind.  Now let's go back to the 2B

24   as in boy and pages 3 and 4.  And we'll stop there.

25        So the second row, which is numbered 18, the Pid

**Exhibit G**

1    number, 575270, is that the same number on the card we saw

2    for -- from the Defendant's extradition paperwork?

3       A.   Yes.

4       Q.   And then lastly, go to the next page.  That address

5    ending in 615, is that the same address that's shown on the

6    I.D. card?

7       A.   Yes.

8       Q.   So the actual receiver of the two payments from Victim

9    2, who is that?

10      A.   That would be Desmond Fodje Bobga in Romania.

11           MR. XIANG:  In Romania.  All right.  No other

12   questions, Your Honor.

13           THE COURT:  Ms. Levin, anything further?

14           MS. LEVIN:  Only one, Your Honor.

15                    RECROSS-EXAMINATION

16   BY MS. LEVIN:

17      Q.   Agent Boling, is there sometimes in your review of

18   Western Union records or Moneygram records, can a payee

19   information ever be different than the person who actually

20   picks up that money?

21      A.   No.

22      Q.   So the payee always, 100 percent of the time, is the

23   person who picks it up?

24      A.   Yes.

25           MS. LEVIN:  Okay.  Nothing further, Your Honor.

**Exhibit G**

1          THE COURT:  Thank you.  Agent, thank you for your

2     testimony both today and the last time we were in this

3     proceeding.  As a witness, you may certainly continue to

4     participate in this video conference hearing.

5          Is there any other testimony or evidence that you

6     need to present, Mr. Xiang?

7          MR. XIANG:  No other testimony, Your Honor.  I

8     think just for housekeeping purposes, I think we had all of

9     the exhibits in evidence I listed on the list.  I just want

10    to confirm for the record that these are quote, unquote, in

11    evidence or at least on the record for Your Honor's

12    consideration.

13         THE COURT:  Are you suggesting that everything on

14    your exhibit list that was provided to me has been used

15    during this proceeding?

16         MR. XIANG:  Yes, Your Honor.  The only -- Exhibit

17    8H as in Henry, we addressed it but didn't quite use it.  I

18    think for purposes of moving them in to be considered, I'll

19    just move them all in --

20         MS. LEVIN:  Your Honor, I don't have any objection.

21         THE COURT:  All right.  Then with that, I am going

22    to admit all of the exhibits that were used during the

23    hearing, which includes those on the exhibit list that was

24    provided to me and counsel in advance of this proceeding here

25    today.  Anything else, Mr. Xiang, in terms of evidence?

**Exhibit G**

1              MR. XIANG:  Your Honor, just that the exhibits that

2   are marked subject to protective order will be sealed to the

3   extent any of these will be public, and that only the

4   versions that are redacted marked with an R will be publicly

5   available.

6              THE COURT:  Understood.  And I agree with that.

7              Ms. Levin, is there any testimony or evidence that

8   you intend to present here today?

9              MS. LEVIN:  Just argument, Your Honor.

10             THE COURT:  All right.  Then let's proceed with

11  argument.  And Mr. Xiang, let's start with you.

12             MR. XIANG:  Your Honor, for this hearing, the

13  Government's burden here is to establish probable cause to

14  believe that a crime was committed and that the Defendant

15  committed it.  And we've shown a PC --

16             THE COURT:  Just a moment, if you would.

17  Mr. Banas, I wonder if you can -- thank you.  You read my

18  mind.  All right.  Go ahead.  Sorry for the interruption.

19             MR. XIANG:  The finding of PC can be supported by

20  direct or circumstantial evidence and the reasonable

21  inferences that can be drawn from both types of evidence.

22             In a circumstantial case, the inference that

23  supports a finding of PC does not need to be the only

24  possible inference, and nor must the Government foreclose

25  every possible innocent explanation.  That's true even after

**Exhibit G**

1   a trial to a jury, and it certainly would be true here for a

2   preliminary hearing.

3          We have strong -- we presented strong

4   circumstantial proof that both crimes were committed and that

5   this Defendant committed them.

6          The crux of the 12 offenses that are charged in the

7   criminal Complaint is the puppy scam that fosters hiding

8   behind the relative anonymity of the Internet in a scheme to

9   deceive consumers into paying hundreds to thousands of

10  dollars each with a purchase and delivery of nonexistent

11  puppies.

12         And although that is a bit of a negative, that

13  there were no puppies to sell or deliver and no intention to

14  sell or deliver these nonexistent puppies at the time that

15  the fraudster was trailing along the customers for money, we

16  have more than sufficient evidence to support an inference of

17  that fact.

18         And I would rely on what we went over as well as

19  the full exchanges contained in the six sets of text messages

20  with the 8514 number and the 4502 number that we went over

21  with Victims 1, 2, 3, 4, 5 and 6.

22         I just want to highlight that.  As we saw with

23  especially Victims 1, 2 and 4, the scheme progressed in

24  increments as you get the victim to pay in stages, a

25  relatively low amount up front, $600, and which we saw was

**Exhibit G**

1  $450 for the supposed puppy, $150 for the shipping.  But then

2  once you get the shipping started, then the puppy supposedly

3  is already in transit somewhere, and the scheme calls for all

4  sorts of excuses to extract more payments.

5      And if you look at Victim 1, fleeced for at least

6  six payments that we saw in the Western Union records; and

7  those six, the six Western Union payments from the Western

8  District of Pennsylvania are the bases of the wire fraud

9  charges at Counts 2 through 7 of the Complaint.

10      And during Special Agent Boling's testimony last

11  time, we matched each of those six payments as being induced

12  by messages that the 8514 number was exchanging with Victim

13  1, promising her that first delivery will be done the next

14  day morning with total refunds.  Then something comes up, and

15  then the puppy is in Kentucky, and then something comes up

16  again, asking for more money, and then the puppy then made it

17  to Maryland, and then something again comes up.

18      And we have probably the most egregious lies about

19  the $1,500 refundable fee to pay for five days of coronavirus

20  quarantine, and then the $980 fee to get refunded the

21  previously paid, quote, unquote, refundable fees.

22      Victim 1 paid everything all the way to the end,

23  and she still got no puppy and no refunds.

24      Looking at all 30 pages of those messages now, we

25  can easily see just from the face of them that this was a

**Exhibit G**

1    scam.  And some of the other victims realized that early,

2    too.  Victim 6, who was in the Western District of

3    Pennsylvania, knew before paying any money.  And Victims 2

4    and 4 realized the scam after one surprise refundable fee

5    request.

6           But the fraudsters preyed on Victim 1's emotional

7    vulnerability.  She said she was getting the dog for her mom

8    since they had to put down her mom's dog, and she thought

9    this dog looked exactly like that.  So she fell for those

10   false premises when there was no dog and no shipping.  And

11   there was no refundable crate or vaccine guarantee either.

12          We saw in the E-mail today with Victim 3 that

13   Supreme Court vaccine guarantee.  We all know from the face

14   of that that that's bogus.

15          The Supreme Court of the United States is not in

16   the business of guaranteeing refunds on crating or shipping

17   puppies.  Just the fact that that is even used at all, and it

18   was actually E-mailed to Victim 3, unlike the draft E-mail

19   that we saw with Victim's 1 info did not have a "sent."  But

20   we know that this E-mail was actually sent because that's

21   what Google's records tell us.

22          And as for who was behind the scheme, well, whether

23   or not that included more co-conspirators, it certainly

24   included -- regardless of how many other co-conspirators it

25   had, it certainly included the Defendant.

**Exhibit G**

1        We went over the two Western Union payments that

2   Victim 2 sent to Romania.  We had gone over this during

3   Special Agent Boling's testimony last time.  But if we look

4   to matching the corresponding lines in the text messages, the

5   payments were also requested to be made to Desmond Fodje

6   Bobga in Romania, as was the first payment, the initial

7   payment request to Victim 1.

8        It was also requested as a Moneygram payment to the

9   Defendant in his own name.  And that didn't pan out.  So more

10  people -- they switched -- directed Victim 1 switch to

11  Western Union, and the payments ended up going over to

12  Romania and were picked up in the names of other individuals.

13       But at least as to Victim 2's two payments, as we

14  just saw, the Defendant himself was the payee.  He used his

15  Cameroonian passport in one and his Romanian I.D. card in the

16  other and picked up both of those in Romania.

17       As for the other individuals, counsel brought up

18  the payments from Victims 3 and 5 that were sent to -- paid

19  out in locations in the United States, and then with Victim 1

20  there were the payments that were received in the names of

21  the other individuals in Romania, some of whom were directly

22  linked to the Defendant.

23       Now, whether or not those individuals were witting

24  participants in the scheme is something that is a different

25  aspect of the story that we don't need to address here.

**Exhibit G**

1    Counsel initially asked in cross-examination of Special Agent

2    Boling how many co-conspirators she thought there were, and

3    she had said that there were a total of two to three in

4    Romania and Cameroon.

5              A co-conspirator is a witting participant.  Whether

6    or not the individuals in Maryland, the other individuals in

7    Romania were witting or unwitting money mules or witting or

8    unwitting participants has no impact on whether or not this

9    Defendant is liable for the offense conduct.

10             If they were unwitting, at a minimum, his use of

11   them to receive the payments is still -- he's still

12   criminally liable by conduct; and if they were witting, then

13   they are simply co-conspirators who committed acts in

14   furtherance of a joint agreement.

15             And even if the messages were -- in the 4502 number

16   were sent by a co-conspirator or if there were payments

17   induced from victims based on co-conspirators' materially

18   false misrepresentations, as long as those were done during

19   the time that this Defendant was a knowing and willing

20   participant in the conspiracy, he's on the hook with

21   Pinkerton liability for the conduct of all other acts

22   committed by others in the joint agreement if they were in

23   furtherance -- within the scope and in furtherance of the

24   conspiracy.

25             So what sets him apart as a witting participant and

**Exhibit G**

1    at a minimum as a culpable Defendant and as a co-conspirator

2    is not only that he picked up the money, but also the cookie

3    links, the recovery E-mail links, the IP address links and

4    the E-mails that we went over today connecting the different

5    accounts, the unitedpetsafe, to the Defendant's personal

6    account, fodjebobga1.

7            They show that he was controlling the -- at least

8    by probable cause and I would submit by evidence beyond a

9    reasonable doubt, that he was the one controlling at a

10   minimum the 8514 Google Voice number and the unitedpetsafe

11   E-mail account, that E-mailed the fake Supreme Court

12   guarantee and had E-mailed to himself his own Romanian

13   university letter.

14           So by being not only behind the messages, behind

15   the accounts that sent the material false representations to

16   the victims inducing the payments, but by also being the

17   direct receiver of some of the payments, this Defendant was a

18   knowing and willful participant in the scam.

19           THE COURT:  I'm going to ask you just a couple of

20   questions to make sure I understand your argument.  First of

21   all, can you identify all the accounts and phone numbers?

22   And when I say accounts, I'm talking about E-mail and phone

23   numbers that the evidence linked to Mr. Bobga?

24           MR. XIANG:  Your Honor, we have the 8514 Google

25   Voice number with the full numbers 434-214-8514.

**Exhibit G**

1              THE COURT:  Right.  There's the unitedpetsafe

2    E-mail; correct?

3              MR. XIANG:  Yes, Your Honor.  That's what we went

4    over today, mainly unitedpetsafe2009@gmail.com.

5              THE COURT:  The joebah77 gmail account?

6              MR. XIANG:  Yes, Your Honor.

7              THE COURT:  And what else?

8              MR. XIANG:  The lovelyteacupchihuahua1 gmail

9    account, that, Your Honor, was the subject of Exhibit 10A as

10   in Adam and 7D as in David.  So that was the E-mail account

11   that's linked to the Defendant and that had responded to the

12   FBI undercover request that we saw.  This was among the first

13   exhibits that we saw.  It was the same -- it was the website

14   that Victims 4 and 6 had E-mailed to -- or had submitted a

15   contact request to and then received a response from the8514

16   number.

17             The FBI UC didn't put in a telephone number.  He

18   only put in his E-mail.  And the E-mail response he received

19   was from lovelyteacupchihuahua1, which said things about

20   being a breeder in Oklahoma City.  It actually was identical

21   to what the 8514 number was telling Victim 6, but not Victim

22   4 because of the change in location, which we submit is -- as

23   we discussed, was a lie, and it was to put distance between

24   Victim 4, who was in Dallas, from the location where the

25   puppy supposedly could be.

**Exhibit G**

1         And I would also note, Your Honor, as we had in the

2    redacted contacts form that Special Agent Boling went over

3    last time, the very first contact submitted through the

4    website was for the E-mail account -- had the E-mail

5    fodjebobga1.  And that we submit is part of the tying him to

6    the scheme.

7         When you set up something for the first time when

8    you do your test run, you want to make sure that it works,

9    and so we think it's no coincidence and actually an act in

10   furtherance of the scheme to have tested out the website's

11   submission form with a co-conspirator's E-mail account.

12        So I think that covers the four E-mail accounts and

13   then the 8514 number.

14        As for whether or not the 4502 Google Voice number

15   was controlled by the Defendant, we believe it is -- it may

16   and it may not; but for purposes of whether or not, I think

17   it doesn't matter here because either he does control them,

18   in which case he's directly liable for them, or he doesn't,

19   but with the -- through Victim 3, which had the

20   communications with the 4502 number and received the

21   fraudulent Supreme Court document from Fodje Bobga's -- one

22   of his E-mail accounts in unitedpetsafe, the 4502 then is an

23   overlapping co-conspirator, which again then would make the

24   Defendant liable through Pinkerton.

25        So it's either he did it directly or a

**Exhibit G**

1    co-conspirator did it, and there -- with an overlapping

2    victim; and, therefore, he's equally culpable under the law.

3            THE COURT:  And one other question going back to

4    your discussion about conspiracy.  Is it your position that

5    in order to have a conspiracy, there has to be multiple

6    participants who are part of the scheme?  In other words, as

7    you've described it, witting participants as opposed to

8    unwitting?

9            MR. XIANG:  Correct, Your Honor, which is why the

10   only one that we are -- we emphasize to a certain degree is

11   the 0347 number.  That's why we went over that.  Victim 4

12   said both the 8514 number and the 0347 number played roles in

13   the scheme against him.  And we showed there were

14   communications between those two numbers.

15           Therefore, at least I would argue I think we can

16   certainly have probable cause to believe that, because those

17   two numbers are communicating with each other, including on a

18   call that lasted over a half minute, that they were

19   controlled by two different people and not one person.

20           THE COURT:  All right.  And that -- I apologize.

21   That was victim -- which victim?

22           MR. XIANG:  Victim 4, Your Honor, that was Exhibit

23   4B as in boy.  That was the group message that had all three

24   on them, 8514, 0347 and Victim 4.

25           THE COURT:  All right.  Thank you very much.  I

**Exhibit G**

1    appreciate that.

2            Ms. Levin, I'm happy to hear from you as well.

3            MS. LEVIN:  Thank you, Your Honor.  The Government

4    obviously presented an awful lot of evidence here.  I'm not

5    going to argue to this Court that there was no scheme, and

6    I'm not going to argue to the Court that, you know, nobody in

7    the Western District of Pennsylvania lost money as a result

8    of this scheme.

9            What I am going to argue to the Court is that there

10   is not probable cause that Mr. Bobga had some kind of

11   agreement for the extent of the scheme as charged in Count 1.

12           Your Honor, Count 1 is charged from June of 2018

13   through present, a conspiracy to commit wire fraud.  And as

14   Your Honor knows, the law requires some kind of agreement

15   among co-conspirators, and the extent of the scheme being

16   reasonably foreseeable to the person who's charged.  And here

17   it's Mr. Bobga.

18           And I don't think we've seen evidence that

19   Mr. Bobga was a knowing participant in the full extent of the

20   scheme here that's being charged in Count 1.

21           Similarly, I don't think we've seen evidence that

22   Mr. Bobga is the one in Counts 2, 3, 4, 5, 6 or 7 who is

23   causing Victim 1 to wire money to Romania.

24           And again, I'll remind the Court in Counts 2

25   through 7 there are others located in Romania, some of whom

**Exhibit G**

1   are students at the same university where the Government is

2   presenting evidence that Mr. Bobga is a student of, who

3   received that money.

4          We see no E-mail communications between alleged

5   co-conspirators.  We've seen no evidence of an agreement

6   between alleged co-conspirators.

7          And then, Your Honor, in Counts 8, 9 and 10, those

8   are individuals in Maryland, Virginia and in Florida who are

9   receiving money.  And we see no evidence that Mr. Bobga had

10  any knowledge that those individuals received money, that

11  that was a part of the agreement, that he benefited from that

12  agreement.

13         And, you know, that's all to understand whether the

14  scope again is reasonably foreseeable to him, that there are

15  individuals in three different states in the United States to

16  which he's never traveled, and for which we've seen no

17  communication that that is part of that scheme.

18         For Counts 11 and 12, Your Honor, so this E-mail

19  with the document that's the subject of both counts, it's

20  dated March of 2019.  We have no IP address information for

21  March of 2019 for this E-mail account.  We have no

22  information about what device the fraudulent document was

23  found on.  We have no communications about this document.

24         And if Mr. Bobga is being charged as a conspirator

25  to either forge a seal or perpetrate identity theft, we have

**Exhibit G**

1    no evidence of an agreement that he understood or

2    participated in this aspect of the scheme here that's being

3    charged.

4            I pointed out in cross-examination that we have

5    different IP addresses here resolving to the United States,

6    to Bangladesh, obviously to Cameroon, and we have no

7    knowledge of any other participants' exact locations -- well,

8    sorry.  We have no knowledge of where in Cameroon any one

9    individual associated with the scheme is located at any point

10   in time.

11           You know, when we see Mr. Bobga's passport, I

12   believe that shows date of birth.  That's not showing any

13   information for exact location within the country of Cameroon

14   at any one point in time.

15           I'm just going over a couple of notes.  Your Honor,

16   the Government is admitting here that they don't have

17   evidence to present showing that Mr. Bobga is the user or the

18   user at any specific moment in time of that Google Voice

19   account.  And we have no voice recording.  We have no bank

20   account information.

21           We just don't have the evidence I believe to show

22   that there's probable cause that he understood the -- that he

23   agreed to fully participate in the scheme anywhere other than

24   the moments in time where the Government has evidence that

25   he -- and, you know, money was received in Romania under his

**Exhibit G**

1    name or anything like that.

2           And I think the point about the IP address I think

3    is important because we know that there are other

4    participants in Romania who received money at different

5    points in time at that same university and would resolve to

6    that same IP address.  Cameroon we know even less about that.

7           And, Your Honor, with that I would argue that there

8    hasn't been probable cause to establish the full extent of

9    the conspiracy charged in Count 1 and that there's not been

10   probable cause to establish the additional counts for the

11   reasons I've mentioned.  Thanks.

12          THE COURT:  All right.  Thank you.  Mr. Xiang, I

13   assume you would like me to give you an opportunity to

14   respond to that.

15          MR. XIANG:  Your Honor, I'll touch on two things.

16   One, counsel said the Government concedes we don't know who

17   controlled the Google Voice account.

18          Just to be clear, there are two Google Voice

19   numbers at play here, the 8514 number and the 4502 number.

20   It's only as to the 4502 number that we're saying, one, we

21   don't have -- we did not present who controlled that number,

22   but we're saying that that is irrelevant for the Court's

23   consideration as to this Defendant's participation.

24          He controlled the 8514 number.  We have that linked

25   to the E-mail account that's associated to the joebah77,

**Exhibit G**

1    which has -- the recovery E-mail is the Defendant's personal

2    account.  And it shares the IP logins with his personal

3    account.  It was directing messages -- from that number were

4    directing payments to be sent to him in Romania.

5         So there's a physical manifestation that matches

6    his conduct in the real world, his personal conduct of

7    getting the money, to the fact that he was the controller of

8    that E-mail account.

9         There's no evidence that any of those other people

10   who picked up the stuff were, but even if they did, those

11   messages are all in the accounts.  We got them months after

12   the fact with search warrants.  Anybody logging in could see

13   them.

14        So if he was making his account -- assuming that he

15   made his communication in the accounts available to other

16   people for use in the same thing, he would know that, and he

17   would see that, and he would see that he's getting the money

18   for it.  And that would also make him a knowing and willful

19   participant, even if what counsel posits could be true.

20        And, you know, as I said at the outset,

21   circumstantial cases will not be 100 percent complete.  That

22   is what a conspiracy is about.

23        There's always going to be a certain level of

24   unknown from an outsider's perspective, from the Government's

25   perspective, from what anybody could see from the outside.

**Exhibit G**

1  You need to be an insider to know everything about what's

2  going on, and we don't have that, but we don't need that.

3  But the law does not require us to present that.

4          Anything from -- at least what we have for 8514 and

5  unitedpetsafe, those two were most certainly this Defendant's

6  accounts, and he got money paid out as a result of his lies.

7          Now, as for Count 1, the scope, I'll agree that we

8  did not present anything here actually stretching the

9  conspiracy back to June of 2018.  But that's immaterial as to

10 finding whether or not -- a probable cause that the offense

11 was committed.

12         Just to highlight, Victim 3 is the earliest that we

13 have in time.  And Victim 3 particularly, we're saying is the

14 Defendant's personal involvement in sending that fake vaccine

15 guarantee from unitedpetsafe2009.  That was in March of 2019.

16         So if we want to have a book end, that would be the

17 first in time, which makes Victim 5, who was a month after

18 that -- a month after that as being within the scope of the

19 conspiracy that he was a part of already.  So -- and that

20 goes all the way up to the latest we have is Victim 1.

21         If there's any argument that maybe he didn't know

22 the full scope at the beginning, well, he certainly knew it

23 after progressing through the five preceding victims with

24 some of them calling him out as being a scam.  And by the

25 point he gets to Victim 1 and strings her along with --

**Exhibit G**

1  also induces to get more money, he knew by then that there

2  was no puppy, there was no delivery, and that this was a

3  fraud, and that he was a part of it.

4       THE COURT:  Could you specifically address Counts

5  8, 9 and 10 and what links the Defendant to those?  We don't

6  need to go through to whom the money was wired.  I just want

7  to know what evidence you presented since we've had multiple

8  hours of this testimony regarding the Defendant's involvement

9  in those.

10      MR. XIANG:  I'll start with Count 8, Your Honor.

11  So that is the wire fraud count relating to the payment by

12  Victim 3.  And so that's the $600 payment that Special Agent

13  Boling went over that was for the puppy.  Then -- which we

14  were saw from the Moneygram record was on -- March 29, 2019,

15  which was the same date of the E-mail from unitedpetsafe to

16  Victim 3 about crating the puppy.

17      So we saw from the -- how the scheme progressed,

18  that you pay for the puppy first, and then you start getting

19  hooked with the shipping, refundable shipping fees.

20      So -- but we know that Victim 3 did not -- we don't

21  have that she paid anything further.  So we're not

22  necessarily saying that the Defendant himself was the one who

23  used the 4502 number to call her or to induce that $600

24  payment.  But as we saw with Victim 4, there were times where

25  two different people played two different roles, one being

**Exhibit G**

1    the supposed shipper and one being the puppy seller.

2            And here, with Victim 3, the Defendant was the

3    overlap as the shipper.  So whoever it is induced her to send

4    the money for the puppy, he was the one who followed up with

5    this vaccine thing.  And through -- if he was not the one who

6    induced her to pay for the puppy in the first place, he was

7    at least already part of the scheme by helping to perpetrate

8    the latter half of it.

9            And that means he has Pinkerton liability for what

10   his co-conspirators did in the first half of the scheme, that

11   he's already a member of the agreement, and that therefore,

12   what other people are doing within the scope of the agreement

13   and in furtherance of it, he's on the hook for it even if he

14   doesn't know that they were happening.

15           And he must have known that they were happening

16   because he was following up with the refundable fee lies to

17   the same victim, who had already paid.  And we know that that

18   always comes after the victim pays for the supposed puppy.

19           THE COURT:  Okay.  As to Count 9?  I just want to

20   know what the link is between the Defendant and the wire.

21           MR. XIANG:  So Counts 9 and 10 are the two payments

22   by Victim 5.  So for Victim 5, we're not saying that there

23   was -- without presenting whether or not there was a direct

24   link between Victim 5 and the Defendant that there was for

25   Victim 3 -- who have a similar E-mail.

**Exhibit G**

1          But because Victim 5 was contacted with the 4502

2     number, the same 4502 number as Victim 3, and Victim 5

3     occurred after Victim 3, meaning that it occurred after we at

4     least have our first day that the Defendant was a part of the

5     scheme, then it's at a minimum pure Pinkerton liability that

6     whoever is behind 4502 victimized other people during the

7     course of the conspiracy that the Defendant was a part of,

8     was a knowing and willful participant in.  And therefore,

9     he's on the -- legally he's on the look for it even if he had

10    no specific knowledge that it happened.

11         THE COURT:  All right.  Thank you.  Ms. Levin,

12    anything further from you?

13         MS. LEVIN:  No, thank you, Your Honor.

14         THE COURT:  All right.  Then let me address as best

15    I can, I appreciate all of your evidence and arguments that

16    you presented here.  Let me start perhaps at the conclusion

17    of the charges.

18         I'm going to first turn to Counts 11 and 12, which

19    relate to using -- in Count 11 sending to Victim 3 a

20    counterfeit seal of a Court of the United States, that being

21    the Supreme Court, and a forged signature of the Clerk, as

22    well as Count 12, which relates to that same issue.

23         There was testimony presented that that document

24    was sent by the e-mail address associated with unitedpetsafe.

25    The recovery E-mail of that, and as the testimony has

**Exhibit G**

1    indicated, is the recovery E-mail associated with the

2    Defendant; and therefore, I am finding that there is probable

3    cause with respect to Counts 11 and 12.

4            Whether or not it was Mr. Bobga that actually

5    forged a document or provided an altered Supreme Court --

6    alleged Supreme Court document I think remains for another

7    day, but I do think there's probable cause that Mr. Bobga

8    committed Counts 11 and 12.

9            With respect to the conspiracy in Count 1, I did

10   not hear any evidence that would suggest the conspiracy began

11   in June of 2018, as set forth in the criminal complaint.  I

12   do note that there was sufficient evidence of a conspiracy

13   with respect to the telephone numbers, and I'm just going to

14   use the end numbers.  I know that's what we've been doing

15   here today between 8514 and 4502.

16           I also believe that there was evidence with a link

17   between phone numbers 8514, which was linked to Mr. Bobga,

18   and 0437.  So there is some evidence of a conspiracy.

19   Whether it is as broad as the Government suggests, I don't

20   believe there's been sufficient evidence presented that all

21   of the recipients of monies were aware of the existence of a

22   conspiracy.  But there is sufficient evidence to support that

23   at least with respect to Victim 4, Victim 3, and Victim 5.

24           Turning to the Counts -- and so I am finding

25   probable cause, although not probable cause before March of

**Exhibit G**

1    2019.

2          Turning to the Counts of wire fraud, which are in

3    Counts 2 through 10, with respect to Counts 2 through --

4    excuse me for a moment -- 2 through 7, there was sufficient

5    evidence presented to show a link between Mr. Bobga and the

6    wires that were sent by Western Union to Romania.  So I do

7    find that there is probable cause to establish a link between

8    Mr. Bobga and the wires themselves.

9          So with respect to Counts 2 through 7, I do find

10   that there is probable cause.

11         I note with respect to Counts 8, 9 and 10, that

12   those communications in part were with the 4502 number,

13   again, just using that.  That number has not been linked to

14   Mr. Bobga.  It has been linked to an alleged co-conspirator.

15         And there was evidence presented that with respect

16   to Victim 3, there were communications with Victim 3 both by

17   the account associated or the Google Voice account associated

18   with Mr. Bobga, 8514, and the unknown account ending with

19   4502.

20         So with respect to Count 8, I believe there is

21   sufficient circumstantial evidence that the Defendant was

22   involved in facilitating the transfer.  I do note that the

23   monies were received by someone in the United States.

24         There's been no link that there was a conspiracy

25   between whoever received those monies and Mr. Bobga based on

**Exhibit G**

1    the evidence presented here today, as I referenced earlier

2    with respect to my discussions about conspiracy.  But I do

3    find that with respect to Count 8, there has been probable

4    cause established.

5            With respect to Counts 9 and 10, the evidence

6    reflected that an alleged co-conspirator with the number

7    ending in 4502 was involved in communications with Victim 5.

8    There was, at least according to what I've heard here today,

9    no evidence linking Mr. Bobga to those communications.

10           I will note that according to the Government, and

11   based on the evidence here today, there was evidence linking

12   account 4502 to account 8514 associated with Mr. Bobga.

13   However, I don't see any evidence presented here today.  Then

14   give me a moment because I want to review everything that I

15   have here -- that Mr. Bobga was involved in those

16   communications.  But please bear with me for a moment while I

17   review a document.

18           (Brief pause.)

19           While there may have been a conspiracy between the

20   unknown 4502 and Mr. Bobga, I don't see any evidence of

21   Mr. Bobga's involvement in that transaction based on the

22   evidence here today.  So I don't believe probable cause has

23   been established for Counts 9 and 10.

24           Those are my findings here today.  I will issue an

25   Order to that effect after this proceeding.

**Exhibit G**

1          Is there anything else that counsel wanted to

2    address during this proceeding?

3          MR. XIANG:  No, Your Honor.

4          MS. LEVIN:  Not on behalf of Mr. Bobga.  Thank you,

5    Your Honor.

6          THE COURT:  All right.  Thank you all.  I

7    appreciate your presentations and patience throughout this

8    proceeding, and that concludes our proceeding here today.

9          MR. XIANG:  Thank you, Your Honor.

10          (Proceedings were concluded at 11:26 a.m.)

11                          –  –  –

12

13

14

15

16

17               C E R T I F I C A T E

18

19          I, Deborah Rowe, certify that the foregoing is

20    a correct transcript from the record of proceedings in the

21    above-titled matter.

22

23    S/Deborah Rowe  _____

24    Certified Realtime Reporter

25

**Exhibit G**